Davis, Judge,
delivered the opinion of the court:
Plaintiff is a small Pennsylvania company, organized in June 1955 to manufacture non-magnetic anchors, chains, tools, fittings, and foundry items. Its sole plant and its mailing address were at Fieldsboro, New Jersey, but the executive officers were stationed some sixty miles away in Chester, Pennsylvania, where an affiliated company was located. During 1956 the employee in charge at Fieldsboro was H. L. Landauer, the Works Manager.[1] He was not authorized to sign, at his own will, contracts with the Federal Government, but he could do so after receiving the prior *3 approval of Mr. Linnenbank, a vice-president (in Chester). The source of the present controversy is that in September 1956 Landauer entered into two Government contracts, on behalf of plaintiff, which plaintiff now disavows as unauthorized. After unexcused delays in shipment, the defendant terminated these two agreements for default, purchased the items from another supplier, and deducted the excess it had to pay ($9,893.32) from amounts due plaintiff under other contracts. Plaintiff sues to recover that sum on the ground that the defaulted agreements were not its responsibility, but were the products of an unauthorized frolic of Landauer’s which the company never confirmed. That is the sole challenge to the defendant’s actions in reletting the contracts.
There is a direct clash between Landauer and Linnenbank as to whether the latter orally approved the former’s signing of these two specific contracts, and on this record we do not find that such prior approval was actually given. Decision turns, rather, on the issues of apparent authority and ratification. If Landauer was apparently endowed with authority to consummate federal contracts, or if the company later ratified his actions, the defendant cannot be held for terminating the agreements and charging the excess costs to plaintiff.
a. It is now commonplace that, except where formality is expressly required, apparent authority to do an act on behalf of a principal may be created by written or spoken words or other conduct of the principal which, if reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. A.L.I., Restatement, Agency 2d, § 27 (1958); Standard Oil Co. v. Lyons, 130 F. 2d 965, 968 (C.A. 8, 1942). The heart of this principle is that it is fair — especially in a complex society where transactions are most often carried on through others — to require “one who allows another to appear to be his agent * * * [to] bear any loss resulting to a third party from his dealings with the apparent agent in that capacity in reliance on his supposed authority.” Mechem, Outlines of the Law of Agency *4 (4th ed., 1952), § 84. The free flow of commerce, large and small, would be shackled if the burden of ascertaining the agent’s real authority were put upon the multitudes of individuals dealing, every day, with agents whose principals seem to have clothed them with adequate authority to do business. Although the Federal Government still stands on the stricter requirements of actual authority for its own agents (see, e.g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947)), the agents of Government contractors are governed by the usual rules.
One familiar type of agency by apparent authority is appointment “to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent.” A.L.I., Restatement, Agency 2d, § 27, Comment a (1958). “It makes no difference that the agent may be disregarding his principal’s directions, secret or otherwise, so long as he continues in that larger field measured by the general scope of the business entrusted to his care.” Kidd v. Thomas A. Edison, Inc., 239 Fed. 405, 407 (S.D.N.Y.), aff'd, 242 Fed. 923 (C.A. 2, 1917). See, also, Mechem, op. cit. supra, § 93; Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F. 2d 823, 834 (C.A. 6, 1941); Arkansas Valley Feed Mills, Inc. v. Fox De Luxe Foods, Inc., 171 F. Supp. 145 (W.D. Ark. 1959), aff'd, 273 F. 2d 804 (C.A. 8, 1960).
Except possibly for one factor, the present case fully meets this classic measure of apparent authority. Plaintiff had but one plant, at Fieldsboro, and its letterhead gave Fields-boro as its only address. The telephone number given in its bids and applications was that of the plant. Landauer, called the “Works Manager,” was the man in charge of the management and operation of that single plant; no one stationed there was above him in authority and no notice was given the defendant of any limitations on his authority. He appeared to be a top management official, though not an officer. He was admittedly authorized to make certain *5 small purchases and minor sales, as well as to sign checks for the payroll and for the purchases he made — so that on the surface he would appear to third parties, unaware of the limitations on his authority, as having the usual buying, selling, and employing functions of a top manager. Lan-dauer consistently held himself out, orally and in writing, as fully competent to deal with Government representatives.[2] He alone dealt on a managerial level with the inspector who came to make the pre-award survey on one of the contracts in suit; the inspector had no contact (and was not asked to make contact) with any of plaintiff’s officers. Whatever phone conversations were had before the awards were with Landauer. He signed all the applications, hids, and correspondence, on behalf of the plaintiff. Four bids on Government work were made by plaintiff in 1956 to the same naval office in Philadelphia (the two in suit and two others); each was signed by Landauer, alone, as “Works Manager.” Plaintiff admits that the bids on the two awards not now involved, though signed only by Landauer, were authorized in advance by Linnenbank; those authorized bids (looking precisely like the bids in suit) were dated and received by the Navy well before September 1956 when it made the awards now challenged. Two negotiated contracts, likewise authorized in advance, were later made with that same Navy office, and each was similarly signed by Landauer alone.[3] Plaintiff thus allowed the Navy to believe that Landauer was its Works Manager, competent to sign Government contracts, and possessed of general contractual authority. The same appearance was maintained at all relevant times. Between February and December 1956, there were some fifteen contacts, written and oral, between the two interested Navy offices (in Philadelphia and Camden) and plaintiff in which Landauer was the sole person to act for the company; there were no contacts with any other representative of plaintiff. *6 Whatever intermittent supervision there was from Chester was invisible to third parties without day-to-day connection with the company.[4]
The short of it is that plaintiff placed Landauer in a managerial position in which (i) outsiders would naturally be led to believe that he had authority to carry on the business of this small company’s sole plant, including the making of contracts which would engage that plant’s facilities, and (ii) Landauer himself was left free to act as if he were the company’s full manager and authorized representative and, in doing so, to exceed his real authority without check or deterrent. Through carelessness or design, this principal pushed its agent to the very forefront of its sole operation and kept well hidden all the strings it had tied to him. It cannot complain if, like Pinocchio, he broke the strings and grasped the substance of the role it allowed him to appear to have. The defendant did not have the burden of ferreting out unrevealed restrictions that might have been placed on the agent. By its own affirmative conduct as well as its omissions, plaintiff made it entirely reasonable for the Government to believe that Landauer had authority to commit the company to the two Government contracts for which it now disclaims responsibility. That he was known not to be an officer of the corporation was immaterial; the important thing was that he was made (and allowed) to appear as the manager of the company’s only operation, and, as such, in charge of that activity with capacity to contract. Cf. Grand Trunk Western R. Co. v. H. W. Nelson Co., supra, 116 F. 2d 823, 833, 834 (C.A. 6, 1941); Phillips Petroleum *7 Co. v. Buster, 241, F. 2d 178, 182-83 (C.A. 10), cert. denied, 355 U.S. 816 (1957). Conversely, the Navy, which obviously thought that it was dealing with an authorized agent, acted reasonably in relying on the image plaintiff had established.
The one factor which gives pause is the requirement, in the defendant’s invitations for bids, that “Bids signed by an agent must be accompanied by evidence of his authority.” None of the four bids made by Landauer in plaintiff’s name— two acknowledged to have been authorized and two disputed in this case — was accompanied by any specific written evidence of his authority.[5] In the circumstances of the case, we think, however, that this absence of 'direct written evidence of authority was neither a fatal defect nor a warning to the Government to question Landauer’s position. Assuming that this provision of the invitation was intended to apply to officers or employees signing on behalf of their own corporation (rather than merely to an outside agent acting for a contractor), we find substantial compliance. Although no written evidence was actually attached to the invitation, prior to the awards there were other evidences of Landauer’s authority already on file within that particular naval office; in that sense the two bids which are now questioned were “accompanied by evidence of * * * [the agent’s] authority” before the awards were made. In February 1956, plaintiff, in a letter signed by Landauer, had requested information from the naval office about Government sales. In June 1956, plaintiff (again through Landauer) had filed a Bidder’s Mailing List Application which expressly gave Landauer as the person authorized to sign bids and contracts in the company’s name.[6] A Supplement to this Application was also signed by the Works Manager. (Plaintiff now rejects these letters and applications, but as we have pointed out plaintiff *8 alone made it possible for Landauer to send them.) Not long before the awards were made on the two bids in suit two other bids in exactly the same form — but conceded to be authorized — had been received by the same Government agency. The agency thus had in its possession four similar bids signed by Landauer when it made the two awards now disputed.[7] In combination, these various papers designating Landauer as a proper employee to sign for plaintiff, taken together with the Government’s other dealings with him, furnished sufficient evidence of his authority. The general requirement that the bid must “be accompanied by evidence of * * * [the agent’s] authority” — unlike the formal certificate demanded for negotiated contracts (see footnotes 3 and 5) — was not intended to call forth any particular form, wording, or proof. Nor was the requirement designed to place on the defendant the risk that the agent might lack real authority. The purpose, rather, was to alert both the contractor and the Government to the subject of the agent’s 'authority and to require, at the least, some solid proof sufficient to warrant the defendant’s entering into a contractual relationship: Here, the showing available to the agency, at the time it made the awards, was more than enough to endow the 'agent with apparent authority to sign. That strong showing constituted adequate “evidence of his authority.”
b. Alternatively, we hold that the plaintiff ratified Lan-dauer’s acts in entering into the contracts. Plaintiff’s executive officers testified that they had no knowledge of the disputed agreements until early January 1957 when they learned from Landauer and the Navy of the contracts’ existence. But it was not until May 17, 1957, after, the default termination of both contracts, that plaintiff first took the position that its Works Manager had acted without authority. In the meantime the officers conferred (on January 10 and February 12,1957) with Navy representatives on the company’s contracts. (By the latter date, one of the contracts in suit had already been terminated.) The contracting offi *9 cer’s contemporaneous memorandum of the February 12th conference gives no intimation that plaintiff’s officers repudiated the two disputed contracts; on the contrary, all the indications are that the officers, affirmatively conducting themselves as if they considered the contracts binding, sought some measure of administrative relief, such as cancellation without cost or, liability. Thereafter the plaintiff apparently attempted to perform the one contract not yet terminated or to subcontract the work; in that connection, plaintiff’s representatives even gave the Navy some informal indication of possible dates of shipment. However, in March 1957, plaintiff wrote, with respect to the unterminated contract, that it had “exhausted every effort to subcontract [the] parts involved” and asked for a no-cost cancellation. The Navy’s response was to end that contract, too, for default. About two months later, after the Navy had charged the company with $9,893.32 in excess costs, plaintiff first suggested that the contracts were not valid.
“An affirmance of an authorized transaction can be inferred from a failure to repudiate it.” A.L.I., Restatement, Agency 2d, § 94 (1958). “If a third person, who has had dealings with a purported agent, reports these to the purported principal under circumstances which reasonably justify an inference of consent unless the principal discloses his dissent, the failure of the principal to dissent within a reasonable time, is, unless explained, sufficient evidence of affirmance.” Ibid., Comment e. See also Comments a. and &., as well as the Reporter’s notes, Appendix, pp. 166-76, 180.
Measured by these principles, plaintiff’s conduct, after it was made aware of the contracts, amounted to ratification. Though it would have been normal to repudiate the agreements at once, and no reason is suggested for postponing that decision, plaintiff did not even hint at this course for several months. Instead, it conferred with the defendant on the basis that the agreements were valid and sought an acceptable way out of its difficulties. With respect to one contract it even made some further efforts toward performance, either through its own facilities or by a subcontract. The Government evidently gave plaintiff some time to see what it could do, and to that extent delayed taking final *10 steps to wind up the transactions. The re-letting of the work by the defendant occurred before the attempted repudiation. Though it is unnecessary to show action in reliance on the ratification, we think that the defendant did adapt its actions to plaintiff’s desire for further time in which to attempt to salvage the contracts. In any case, plaintiff’s course of conduct implies that it ratified the agreements well before it tried to repudiate them.
The plaintiff is not entitled to recover and the petition is dismissed.
FINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized in June 1955 under the laws of the State of Pennsylvania for the purpose of engaging in the manufacture of non-magnetic anchor, anchor chain, tools, fittings, and foundry items. Plaintiff’s plant was at all pertinent times located at Fieldsboro, New Jersey, and plaintiff’s address appeared on its letterhead as P.O. Box 100, Fieldsboro, New Jersey. Plaintiff’s executive offices were at all pertinent times maintained in Chester, Pennsylvania, 60 miles from Fieldsboro, in physical conjunction with Baldt Anchor, Chain & Forge Division of the Boston Metals Company with which plaintiff was affiliated by ownership.
2. (a) This case arises out of two supply contracts entered into by plaintiff with defendant, acting through the United States Navy General Stores Supply Office, Philadelphia, Pennsylvania, both of which contracts were terminated for default. Defendant thereafter deducted from amounts due plaintiff under other contracts the sum of $9,893.32 which defendant incurred in excess costs of procurement of the contract items.
(b) Plaintiff contends that the two above-mentioned supply contracts were not legally or morally binding upon plaintiff, that they were signed for plaintiff by a person in a subordinate capacity who had no authority to bind plaintiff, that defendant had either actual or constructive notice of this fact, and that plaintiff made a mistake in computing the *11 bid in that several required machine operations were omitted from the computation, and that this fact was known to defendant prior to the date of the award.
(c) Defendant contends that plaintiff’s employee who signed the two above-mentioned supply contracts was put in a position of such responsibility by plaintiff’s corporate officials as to justify belief and reliance by the government on his contractual authority, actual or implied; that plaintiff ratified the contracts by its failure to repudiate them and to assert the employee’s alleged lack of authority prior to the date of termination, and by plaintiff’s efforts to perform and/or to subcontract; and that plaintiff had knowledge of the mistake in computing the bid and was given opportunity to withdraw prior to the award but declined to do so.
(d) It is agreed by the parties that if defendant is found liable, a judgment should be entered against defendant in the total amount of $9,893.32 which is the sum defendant deducted from amounts otherwise due plaintiff under other contracts.
3. The executive vice president of plaintiff, Mr. E. J. McGuiness, and another vice president of plaintiff, Mr. C. D. Linnenbank, were at all pertinent times officed in the plaintiff’s executive offices at Chester, Pa. Mr. McGuiness was entirely responsible for the operation of plaintiff company. He was the sole company official responsible for the furnishing of a financial statement or balance sheet of the company to the government, and for the employing and discharging of personnel. Both Mr. McGuiness and Mr. Linnenbank had authority to execute any and all contracts on behalf of plaintiff. Mr. McGuiness visited plaintiff’s plant at Fieldsboro very infrequently. Mr. Linnenbank’s duties included overseeing of the operations at the plant at Fieldsboro, which he visited about once a week.
4. The management and operation of plaintiff’s plant at Fieldsboro was under the direct charge and supervision of Mr. H. L. Landauer, who was employed as works manager in January 1956 by Mr. McGuiness and Mr. Linnenbank at Chester, and who was stationed at the Fieldsboro plant. At the time of the employment of Mr. Landauer as works man- *12 ager, plaintiff was a relatively new company with a comparatively small plant employing not in excess of 25 or 30 employees. There was no one stationed at the plant who was above Mr. Landauer in authority and he had various duties and corresponding authority in the operation of the plant, including the making of certain small purchases for operation of the plant, signing of checks for these purchases and the payroll, and the making of minor sales from stock. As previously indicated, all of Mr. Landauer’s functions were, however, subject to the overall supervision of vice president Linnenbank with whom Mr. Landauer discussed anything of import in connection with the plant. Mr. Landauer’s duties did not include the preparation and issuance of plaintiff’s financial statements or the preparation of bids, but he did have authority to sign bids and contracts on behalf of plaintiff with the prior approval in each instance of vice president Linnenbank.
5. (a) As appears in detail hereinafter, during the year 1956 plaintiff entered into six contracts with defendant, acting through the United States Navy General Stores Supply Office, Philadelphia, Pennsylvania, four of which contracts were awarded on bids and two of which were negotiated. Two of the award contracts, out of which arise the instant suit, will usually be referred to hereinafter as Suit Contract N155-25219 and Suit Contract N155-25122, respectively. The other contracts will usually be referred to hereinafter as Other Contract N155-26501, Other Contract N155-25480, Other Contract N155-24914, and Other Contract N155-25499, respectively.
(b) The bid form, as filled out on each of the award contracts, gave the name of plaintiff as bidder, plaintiff’s address as Front Street, P.O. Box 100, Fieldsboro, New Jersey, and bore the signature of H. L. Landauer, works manager, as the person authorized to sign the bid. Each of the two negotiated contracts was signed in behalf of plaintiff by H. L. Landauer, works manager, with the address of plaintiff given as P.O. Box 100, Fieldsboro, New Jersey, and contained a certificate of C. I). Linnenbank that he was then the vice president of plaintiff and that H. L. Landauer, who signed the contract in behalf of the contractor (plaintiff), *13 was then works manager of plaintiff and that the contract was duly signed for and in behalf of plaintiff by authority of plaintiff’s governing body and was within the scope of its corporate powers. The invitation for bids in each of the award contracts gave the name of I. M. Kovar as the contracting officer; and each of the negotiated contracts was signed in behalf of defendant by I. M. Kovar, contracting officer.
6. A letter dated February 21, 1956, on the letterhead of American Anchor & Chain Corporation, P.O. Box 100, Fieldsboro, New Jersey, addressed to General Stores Supply Office, 700 Bobbins Avenue, Philadelphia 11, Pennsylvania, requested that plaintiff be entered on the mailing list to receive information concerning the sale by the General Stores Supply Office of certain surplus material. This letter was signed “H. L. Landauer, Works Manager.”
7. Under date of June 12, 1956, there were filled out and sent to defendant:
(a) A Bidder’s Mailing List Application, addressed to Navy Department, General Stores Supply Office, 700 Bobbins Avenue, Philadelphia 11, Pa., which application listed American Anchor & Chain Corp. as the applicant. The address to which bidding forms were to be mailed was given as P.O. Box 100, Fieldsboro, N. J. The address of the main business office was given as P.O. Box 100, Fieldsboro, N. J. The names of the president, vice presidents, secretary, and treasurer of plaintiff were listed. Under the heading “Persons or firms authorized to sign bids and contracts in your name (If agent, so specify)” appeared the name “H. L. Landauer” in the “official capacity” of “Works Manager.” Under the heading “Persons to contact on matters concerning bids and contracts (If agent, so specify) ” appeared the name “H. L. Landauer” in the “official capacity” of “Works Manager.” The telephone number of the plant was listed. The form bore the signature of H. L. Landauer. On the reverse side of the form appeared the following:
information and instructions
Persons or firms wishing to bid or negotiate on the supply and service requirements of the Federal Govern *14 ment must file a properly completed and certified bidders’ mailing list application, together with such other lists as may be attached to the application form, with each procurement office of the Federal Executive Agency with which they desire to do business. The attached list will itemize the types of supplies and services regularly purchased by the using agency and will include specific instructions concerning its completion. Such application and list shall be presented and signed by the principal as distinguished from an agent, however constituted.
After placement on the bidders’ mailing list op an agency, a supplier’s consistent failure to respond (submission of bid, or notice, in writing that you are u/n-able to bid on that 'particular transaction, but wish to remain on the actwe bidders’ mailing list for that particular term) to invitations to bid will be understood BY THE AGENCY TO INDICATE LACK OF INTEREST AND CONCURRENCE IN THE REMOVAL OF THE SUPPLIER’S NAME FROM THE AGENCY’S BIDDERS’ MAILING LIST.
(b) A Bidder’s Mailing List Application Supplement which listed the name and address of the applicant as American Anchor & Chain Corp., P.O. Box 100, Fieldsboro, N.J. Under a heading “Contracts held with armed services during past 12 months (List separately)” appeared the word “None.” Under the heading “Products produced for or services supplied to armed services from January 1940 through December 1945” appeared the word “None.” Under the heading “Types of equipment, components, material and/ or services now being manufactured, performed, or developed” appeared the following: “Chain, chain accessories, forgings, non-ferrous castings.” Under the heading “Machinery and equipment” appeared the following: “Tool room equipment, foundry equipment, forge shop, press equipment, heat treating, testing.” Under the heading “Testing and/or laboratory facilities” appeared the following: “Complete testing equipment.” It was indicated on the form, as filled out, that there was being enclosed with the form a catalog and descriptive literature. The form was signed “H. L. Lan-dauer, Works Manager.”
8. (a) At the trial Mr. Landauer testified that he signed the applications referred to in finding 7, supra, at the request of vice president Linnenbank; but Mr. Linnenbank testified that to the best of his recollection he did not direct Mr. *15 Landauer to sign them and that he had not seen the applications until the day prior to his testimony.
(b) In order to receive “Information for Bidders” from the government it is necessary that prospective bidders first submit an application therefor. In determining who is authorized to sign bids and contracts for an applicant, the contracting officer gives “great weight” to the signature on the Bidder’s Mailing List Application.
9. (a) On June 26, 1956, there was issued by the Navy Department, General Stores Supply Office, 700 Robbins Avenue, Philadelphia, an invitation for bids for the supply of various numbers and sizes of bronze pipe fittings with pre-inserted silver brazing rings and for sleeves of carbon steel to be delivered to naval installations throughout the United States and the then Territory of Hawaii. The terms and conditions of the invitation for bids contained the following language:
(b) Each bidder shall furnish the information required by the bid form. The bidder shall print or type his name on the Schedule and each Continuation Sheet thereof on which he makes an entry. Erasures or other changes must be initialed by the person signing the bid. Bids signed by an agent must be accompanied by evidence of his authority.
(b) As appears hereinafter (finding 18(a)), plaintiff’s bid following the foregoing invitation for bids was accepted, with Suit Contract N155-25219 resulting.
10. (a) On July 5, 1956, there was issued by the Navy Department, General Stores Supply Office, 700 Robbins Avenue, Philadelphia, an invitation for bids for the supply of 19,200 nickel-copper alloy lubrication fittings to be delivered to various naval installations throughout the United States and the then Territory of Hawaii. The terms and conditions of the invitation for bids contained the same language quoted in finding 9(a), supra.
(b) As appears hereinafter (finding 19 (a)), plaintiff’s bid following the foregoing invitation for bids was accepted, with Suit Contract N155-25122 resulting.
11. (a) On July 17, 1956, there was issued by the Navy Department, General Stores Supply Office, 700 Robbins Avenue, Philadelphia, an invitation for bids for the supply of *16 marine anchor. The terms and conditions of the invitation for bids contained the same language quoted in finding 9(a), supra.
(b)As appears hereinafter (finding 21), plaintiff’s bid following the foregoing invitation for bids was accepted, with Other Contract N155-25480 resulting.
12. (a) On July 18, 1956, plaintiff submitted its bid in response to the invitation for bids which had been issued on June 26, 1956 (finding 9(a), supra). In plaintiff’s bid the full name of the bidder was given as American Anchor & Chain Corp. The business address of the bidder was given as Front St., P.O. Box 100, Fieldsboro, New Jersey. The telephone number given was the number of the plant. In the box on the form in which was to be given the signature of the person authorized to sign the bid was the signature of H. L. Landauer. In the box on the form in which was to be given the signer’s name and title appeared “H. L. Landauer, Works Manager.”
(b) At the trial Mr. Landauer testified that he had no independent recollection regarding the computations included in the bid or of signing the bid, but identified his signature on the bid. He stated emphatically that he had not signed any bids without the prior approval of Mr. Lin-nenbank. Mr. Linnenbank testified with equal emphasis that he did not tell Mr. Landauer to sign the bid and, as appears in finding 29 (b), infra, that he had no knowledge of the resulting contract until January 1957.
(c) There is no evidence that plaintiff’s bid was accompanied by specific written evidence of Mr. Landauer’s authority to sign the bid.
(d) In the latter part of July 1956 a preaward survey was conducted by the Inspector of Naval Material, Camden, New Jersey, with respect to the ability of plaintiff to deliver within 120 days from receipt of award the items listed in defendant’s invitation for bids which had been issued on June 26, 1956 (finding 9(a), supra). The inspector who conducted the survey visited plaintiff’s plant two or three times where he talked with Mr. Landauer, plaintiff’s works manager. There was never any doubt in the mind of the inspector that Mr. Landauer was in charge of operations of *17 the plant. The inspector had no contact with any of the officers of plaintiff. The results of the survey were sent to the Commanding Officer, General Stores Supply Office, under date of August 20, 1956 (finding 16(a), infra).
(e) A letter dated July 27, 1956, on the letterhead of plaintiff, addressed to General Stores Supply Office, 700 Robbins Avenue, Philadelphia, Pa., reads as follows:
Gentlemen:
RE: IFB-155-(3)-2036-56
In confirmation of telephone conversation this date between the undersigned and your Mr. J. J. Wiliczek, we wish to advise that we will supply material on above invitation at price quoted.
With reference to the questions on page 17 of above invitation we wish to advise the following:
1 — Supplies will not be furnished from stock or Government surplus.
2 — American Anchor & Chain Corp. is the manufacturer.
3 — The location of our plant is Fieldsboro, N.J.
4 — Articles may be inspected at Fieldsboro, N.J.
Very truly yours,
s/ H. L. Landauer
H. L. Landauer
Works Manager
(f) The reference in the above letter to IFB-155- (3) -2036-56 is to the invitation for bids issued June 26, 1956 (finding 9(a), supra).
(g) At the trial Mr. Landauer testified that although he signed the above letter, it was either dictated for his signature by vice president Linnenbank or it was written by vice president Linnenbank for his (Mr. Landauer’s) signature “because these are the kinds of things I never did of my own volition.” Mr. Landauer did not remember the conversation with Mr. J. J. Wiliczek, referred to in the above letter.
(h) Plaintiff’s bid was the lowest bid and, as appears hereinafter (finding 18(a)), it was subsequently accepted, with Suit Contract N155-25219 resulting.
13. (a) On July 27, 1956, plaintiff submitted its bid in response to the invitation for bids which had been issued on July 5, 1956 (finding 10(a), supra). In plaintiff’s bid the *18 full name of tbe bidder was given as American Anchor & Chain Corp. The business address of the bidder was given as Front Street, P.O. Box 100, Fieldsboro, New Jersey. The telephone number given was the number of the plant. In the box on the form in which was to be given the signature of the person authorized to sign the bid was the signature of H. L. Landauer. In the box on the form in which was to be given the signer’s name and title appeared “H. L. Land-auer, Works Manager.”
(b) At the trial both Mr. Landauer and Mr. Linnenbank gave the same testimony with respect to the above bid that they gave with respect to plaintiff’s bid of July 18, 1956 (finding 12(b), supra).
(c) There is no evidence that plaintiff’s bid was accompanied by specific written evidence of Mr. Landauer’s authority to sign the bid.
(d) Plaintiff’s bid was the lowest bid and was subsequently accepted (finding 19 (a), infra), with Suit Contract N155-25122 resulting.
14. (a) On August 1, 1956, there was issued by the Navy Department, General Stores Supply Office, 700 Robbins Avenue, Philadelphia, an invitation for bids for the supply of navy tool kits. The terms and conditions of the invitation for bids contained the same language quoted in finding 9(a), supra.
(b) As appears hereinafter (finding 22), plaintiff’s bid following the foregoing invitation for bids was accepted, with Other Contract N155-25499 resulting.
15. (a) On August 3, 1956, plaintiff submitted its bid in response to the invitation for bids which had been issued on July 17, 1956 (finding 11(a), supra). In plaintiff’s bid the full name of the bidder was given as American Anchor & Chain Corp. The business address of the bidder was given as Front St., P.O. Box 100, Fieldsboro, N.J. The telephone number given was the number of the plant. In the box on the form in which was to be given the signature of the person authorized to sign the bid was the signature of H. L. Landauer. In the box on the form in which was to be given the signer’s name and title appeared “H. L. Landauer, Works Manager.”
*19 (b) At the trial Mr. Liimenbank, plaintiff’s vice president, testified that he gave Mr. Landauer the figures to put in the bid and specifically authorized him to sign the bid.
(c) There is no evidence that plaintiff’s bid was accompanied by specific written evidence of Mr. Landauer’s authority to sign the bid.
(d) Plaintiff’s bid was subsequently accepted (finding 21, infra), with Other Contract N155-25480 resulting.
16. (a) A memorandum dated August 20, 1956, from the Inspector of Naval Material, Camden, N.J., to the Commanding Officer, General Stores Supply Office, 700 Robbins Avenue, Philadelphia, regarding the preaward survey which was conducted the latter part of July (finding 12(d), supra), reads in part as follows:
Enel: (1) Company Balance Sheet of 31 May 1956
(2) List of company facilities
íjí «i»
A. Organization
The American Anchor and Chain Corporation was founded and incorporated in June 1955 under the laws of the State of Pennsylvania. The company is presently engaged in the manufacture of non-magnetic anchor chain and fittings for the Navy Department, Bureau of Ships.
Management officials include:
Mr. John D. Shapiro — President
Mr. C. J. Guiness [sic] — Vice President
Mr. Adolph Gillman — Secretary
Mr. M. Shapiro — Treasurer
Mr. H. O. [sic] Landauer is the company’s works manager and he is the designated official responsible for government contracts.
B. Financial
The company is listed, but as yet not rated by the Dun & Bradstreet Company. Their primary banking affiliation is with the Delaware County Bank of Chester, Pa. The company’s sales volume for the last fiscal year totaled $400,000, consisting of material of their own manufacture. Enclosure (1), representing the company’s most current balance sheet, is indicative of their financial strength and it precludes the possibility of financial delays in the completion of the subject invitation.
*20 C. Production,
A review of tbe company’s planned production revealed that they intend to use a permanent mold process of casting the required fittings and finish machine and grind the f acings and fins.
The required permanent molds are to be made within their own shop.
It is to be noted that the company is currently installing (3) Stroeham gas furnaces and have not produced any material of this type as yet.
A review with the company of the applicable drawings disclosed that they had overlooked several required machining operations and also the requirements for the pre-inserted ring, when they submitted their bid. Despite this oversight the company was willing to absorb any loss in order to establish themselves as a supplier of this type material.
D. Contractual Performance
The company is at present engaged in the manufacture of non-magnetic bridle chains and accessories of forged steel at the production rate of $40,000 per month. They are a subcontractor to the Baldt Anchor Company on contract NObs-59959. The subcontract is presently in a delinquent delivery status and the material has not always met specification requirements, necessitating rework of the material.
E. Personnel
In addition to the officer personnel and the Works Manager as listed in paragraph A., the company employs 27, namely:
2 — administrative
4 — supervisory-technical
6 — journeymen, machinists and toolmakers
15 — production operators
The company is operating on a 2 shift, 5 day week, and the employees are represented by the Local ISMW V with National affiliation in the AF of L/CIO.

F. Plant Facilities

The company occupies a one story masonry building on a tract of land 18,000 square feet in area.
The production equipment as listed on enclosure (2) appears to be in good working and maintenance condition. In addition, the company has adequate facilities to perform the required hydrostatic tests.
*21 The company will not commence the manufacture of the required permanent molds until they have received notification of the award.
G. Security
The name of the company is not included in the “Consolidated Listing of Security Cognizance Assignments for the Department of Defense”.
Fire protection is offered the company by a local volunteer fire company.
H. Transportation
The plant is serviced by numerous trucking firms and a railroad siding is located adjacent to the property.
I. Power and Fuel
The company does not generate any of its power requirements. All electric power is purchased from the Public Service Co. of N. J. Fuel oil for heating purposes is purchased from the local dealers.
J. Conclusions and Recommendations
In summary, as requested in the format of paragraph 3 of reference (a), it is the opinion of the Inspector that the American Anchor & Chain Corporation
(a) Has the financial ability to perform without government assistance.
(b) Has the machinery and facilities to perform within the required time.
(c) Has the facilities to preserve, package and pack material in accordance with applicable specifications.
id) Has personnel available to perform.
(e) Has reasonably firm commitments from sup-of raw materials or
¡an make delivery as specified in bid or quotation.
(g) Can furnish material in accordance with applicable specifications.
The Inspector is of the opinion that the American Anchor & Chain Corp. can satisfactorily produce the required fittings within the specified delivery time. Since this is the initial attempt on the part of the company to manufacture material of this type, this opinion is based on the fact that the company has the necessary facilities and manpower, and the production lead time is normal.
Due to the oversight on the part of the bidder in computing his bid price, (as explained in paragraph C.) the *22 contract if awarded will probably result in a loss. Further, the bidder was informed of the procedure for appeal of which he declined to take advantage. He, in effect has indicated that he will absorb the loss and still perform satisfactorily.
In view of the above, the Inspector recommends that the award be made in favor of the American Anchor and Chain Corporation contingent on the following:
(a) That the bidder reaffirm his bid price in writing to the contracting officer.
(b) That a performance bond be posted by the bidder in the entire amount of the contract.
s/ E. L, Hildebrand
E. L. Hildebrand
(b) The enclosures indicated in the memorandum were (1) a balance sheet dated May 31,1956, in which were listed plaintiff’s assets and liabilities, and (2) a list of plaintiff’s machinery and equipment which bore the heading “American Anchor & Chain Corp., Fiéldsboro, New Jersey.”
17. (a) On August 23, 1956, plaintiff submitted its bid in response to the invitation for bids which had been issued on August 1, 1956 (finding 14(a), supra). In plaintiff’s bid the full name of the bidder was given as “American Anchor & Chain Corp.” The business address of the bidder was given as Front St., Fiéldsboro, New Jersey. The telephone number given was the number of the plant. In the box on the form in which was to be given the signature of the person authorized to sign the bid was the signature of H. L. Landauer. In the box on the form in which was to be given the signer’s name and title appeared “H. L. Land-auer, Works Manager.”
(b) At the trial Mr. Linnenbank, plaintiff’s vice president, testified that he specifically authorized Mr. Landauer to sign the bid.
(c) There is no evidence that plaintiff’s bid was accompanied by specific written evidence of Mr. Landauer’s authority to sign the bid.
(d) Plaintiff’s bid was subequently accepted (finding 22, infra), with Other Contract N155-25499 resulting.
*23 18. (a) Under date of September 7, 1956, plaintiff was notified that its bid of July 18,1956 (finding 12(a), supra), in response to the invitation for bids issued June 26, 1956 (finding 9(a), supra), was accepted and that plaintiff was awarded Suit Contract N155-25219 for a total contract price of $8,171.70. The delivery date was January 31,1957.
(b) The award form contained the following language:
THIS AWARD CONSUMMATES THE CONTRACT, WHICH CONSISTS OK THE FOLLOWING DOCHMENTS, INCLUDING ANT CONTINUATION SHEETS THERETO: (A) THE GOVERNMENT’S INVITATION KOR RIDS AND TOUR BID, (B) THE SCHEDULE, (0) THE GENERAL PROVISIONS, AND (D) THE GOVERNMENT’S AWARD. NO FURTHER CONTRACTUAL DOCUMENT IS NECESSARY.
(c) The General Provisions of the contract read in part as follows:
11. Default
(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; * * *
* * * ❖ *
(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those *24 so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
❖ * * $
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Conractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. * * *
19. (a) Under date of September 14, 1956, plaintiff was notified that its bid of July 27,1956 (finding 18(a), supra), in response to the invitation for bids issued July 5, 1956 (finding 10(a), supra), was accepted and that plaintiff was awarded Suit Contract N155-25122 for a total contract price of $4,620. The delivery date was December 12, 1956.
(b) The award form contained the same language quoted in finding 18 (b), supra.
(c) The General Provisions of the contract contained the same language quoted in finding 18 (c), supra.
20. Under date of September 20, 1956, plaintiff entered into negotiated Other Contract N155-24914 with defendant acting through the United States Navy General Stores Supply Office, Philadelphia, to supply link and link swivel for a total contract price of $395. As heretofore indicated (finding 5 (b)), the contract contained a certificate of C. D. Lin-nenibank that he was then the vice president of plaintiff and that H. L. Landauer, who signed the contract on behalf of the contractor (plaintiff), was then works manager of plaintiff, and that the contract was duly signed for and in behalf of plaintiff by authority of plaintiff’s governing body and was within the scope of its corporate powers. This contract was terminated for default on May 1, 1957.
*25 21. Under date of September 21,1956, plaintiff was notified that its bid of August 3, 1956 (finding 15(a), supra), in response to the invitation for bids issued July 17,1956 (finding 11(a), supra), was accepted and that plaintiff was awarded Other Contract N155-25480 for a total contract price of $28,125. This contract was completed on January 30,1957.
22. Under date of September 25,1956, plaintiff was notified that its bid of August 23, 1956 (finding 17(a), supra), in response to the invitation for bids issued August 1, 1956 (finding 14(a), supra), was accepted and that plaintiff was awarded Other Contract N155-25499 for a total contract price of $6,287.60. This contract was completed on February 6,1957.
23. (a) Under date of October 5,1956, modification number 1 was issued to Suit Contract N155-25122. The modification involved a relaxation of packing requirements on certain shipments and was mailed to plaintiff at P. O. Box 100, Fieldsboro, N.J. The modification was acknowledged on the form by H. L. Landauer on behalf of plaintiff.
(b) Under date of October 15, 1956, modification number 2 was issued to Suit Contract N155-25122. The modification involved a diversion of shipment from Pearl Harbor to San Francisco, and was likewise mailed to plaintiff at P. O. Box 100, Fieldsboro, N.J.
24. (a) Under date of October 17,1956, modification number 1 was issued to Suit Contract N155-25219. The modification involved two diversions of shipments and was mailed to plaintiff at P.O. Box 100, Fieldsboro, N.J.
(b) Under date of November 26, 1956, modification number 2 was issued to Suit Contract N155-25219. The modification involved two diversions of shipments and was mailed to plaintiff at P.O. Box 100, Fieldsboro, N. J.
25. (a) On December 14, 1956, Mr. Landauer, plaintiff’s works manager, went to the United States Navy General Stores Supply Office in Philadelphia where he visited with Miss Alice Fritz, the contract supervisor who had charge of the administration of plaintiff’s contracts with defendant. Mr. Landauer stated that plaintiff was not equipped to pro *26 duce certain items (fittings) called for under Suit Contract N155-25122, and requested that Suit Contract N155-25122 be canceled. He further stated that the person who had made up plaintiff’s 'bid had not realized that the fittings were to be of copper-nickel alloy (Monel) bodies requiring a casting operation which plaintiff was not equipped to do; and that plaintiff, as a new company, was not in a position to sustain the loss involved in subcontracting the work. The contract supervisor, Miss Fritz, then reviewed the contract papers and explained to Mr. Landauer that since plaintiff had been given an opportunity to confirm its bid before award, that “this could not be considered what we call a mutual mistake,” but that she would find out from the navy stock control people whether the items were still needed, and that if the items were still needed, plaintiff should attempt to subcontract the work.
(b) On December 17, 1956, Miss Fritz telephoned Mr. Landauer and told him that the navy stock control people had 'advised that the items (under Suit Contract N155-25122) were still needed.
26. Under date of December 19, 1956, plaintiff entered into negotiated Other Contract N155-26501 with defendant acting through the United States Navy General Stores Supply Office, Philadelphia, to supply link and link swivel for a total contract price of $1,094.15. As heretofore indicated (finding 5 (b)), the contract contained a certificate of C. D. Linnenbank that he was then the vice president of plaintiff and that H. L. Landauer, who signed the contract on behalf of the contractor (plaintiff), was then works manager of plaintiff, and that the contract was duly signed for and in behalf of plaintiff by authority of plaintiff’s governing body and was within the scope of its corporate powers. This contract was subsequently terminated for default.
27. (a) A letter dated December 19, 1956, addressed to Mr. C. D. Linnenbank, Vice-President, American Anchor & Chain Corp., Fieldsboro, New Jersey, and signed H. L. Landauer, Works Manager, reads as follows:
Please accept this letter as a notification of my resignation as Works Manager of the plant of American Anchor & Chain Corp., in Fieldsboro, N.J.
*27 I would like to make this effective on January 15,1957, or sooner, whichever suits your convenience.
Mr. B. Haywood is acquainted with all office details and procedures and Mr. W. Crissman is able to take care of any shop operation which we have.
(b) At the trial Mr. Landauer testified that he resigned in order to take a better job which he had secured at the time. He stated in effect that he was dissatisfied working for plaintiff as works manager because he did not like to exercise “authority through someone else.”
28. (a) Early in January 1957 Mr. Landauer sent a letter to the executive offices in Chester, Pennsylvania, to the effect that Miss Fritz, the contract supervisor, had advised that Suit Contract N155-25122 was going to be canceled and that plaintiff would be assessed for any loss that there might he to the government.
(b) At the trial the executive vice president of plaintiff, Mr. E. J. McGuiness, testified that the foregoing letter constituted “the first knowledge I had that there were any contracts with the Government”; and that upon receipt of the letter he tried to reach Mr. Landauer, the works manager, at Fieldsboro, but he had gone.
29. (a) On or about January 10, 1957, an official of the Camden, New Jersey, navy office telephoned to the executive offices of plaintiff in Chester, Pennsylvania, and advised that certain contracts which plaintiff had with the United States Navy General Stores Supply Office, Philadelphia, were in threat of default and suggested that vice president Linnen-bank go to Camden to confer with navy officials concerning the contracts. On the next day or so, Mr. Linnenbank met in Philadelphia with the navy officials whom he advised that the contracts were “strange” to him, and that he would “get into it immediately and see what the situation was, and do whatever necessary.”
(b) At the trial vice president Linnenbank testified that he had no knowledge of either Suit Contract N155-25219 or Suit Contract N155-25122 until January 1957.
30. (a) A letter dated January 16, 1957, addressed to American Anchor & Chain Corporation, P.O. Box 100, *28 Fieldsboro, N.J., from defendant’s contracting officer, reads as follows:
Subject: Termination #2079D
Contract N155-25122
Keqn. 155/103113F/56
Apprn. 17X4911 NSF (Allotment 155/70000)
Exp. Acct. 51000
Total Amount of Contract $4,620.00
Gentlemen:
The subject contract, awarded 14 September 1956, provided that delivery of the articles specified therein be made on or before 18 December 1956. Notwithstanding this provision, records of this office indicate that no delivery has been made.
It is the judgment of the Contracting Officer that the delay in delivery has not been occasioned by causes beyond your control and without your fault or negligence. Accordingly, as a result of your default in performance, and in exercise of the rights reserved to the Government under paragraph (a), Section 11 of the General Provisions of this contract entitled “Default”, you are hereby notified to terminate all work under the subject contract and make no deliveries. This termination shall become effective 18 January 1957.
You are further notified that the Government intends to exercise its rights to re-purchase the material from other sources and charge against your account any excess costs which may be incurred.
(b) Contract N155-25122, referred to in the above letter, is Suit Contract N155-25122.
31. Under date of January 31, 1957, modification number 3 was issued to Suit Contract N155-25219. The modification involved a change in testing requirements and was mailed to plaintiff at Post Office Box 100, Fieldsboro, New Jersey.
32. On or about February 4, 1957, plaintiff’s officers petitioned the Navy General Stores Supply Office for a conference.
33. Under date of February 6,1957, modification number 4 was issued to Suit Contract N155-25219. The modification involved a diversion of delivery and was mailed to plaintiff at Post Office Box 100, Fieldsboro, New Jersey.
34. (a) On February 12, 1957, plaintiff’s officials con *29 ferred with, defendant’s contracting officer in Philadelphia respecting all sis of plaintiff’s contracts with defendant.
(b) A memorandum prepared by defendant’s contracting officer following the conference reads as follows:
Sub]': Contracts N155-25219, 24914, 25499, 26501, and 25122 with American Anchor & Chain Corp.
1. Messrs. McGinnis [sic], Linnenbank, and Money visited this office to discuss open contracts with American Anchor & Chain Corp. The discussion began with an explanation as to why the above company has had difficulty in performing contracts, specifically Contract N155-25122 and 25219 the former having been terminated for default. The works manager, a Mr. Lan-dauer, and another employee had been fired apparently due to their incompetence in the bidding on the above two contracts plus other factors. Mr. Linnenbank explained that the corporation was unable to make the items under contract 25219. I explained that if the Government no longer needed the material we would cancel the contract without cost or liability. However, this was a remote possibility and they should not place much hope here. (I have since discussed the need for the material with Lt. Dauchess, Code 150A who has advised that the need still exists for all the items in all the quantities under the contract.) I advised them to give serious consideration to subcontracting. If they could not we would be forced to terminate for default and buy against their account as on contract 25122. Mr. McGinnis [sic] explained that the company had utilized all of its working capital and then some and any termination for default would probably force them to close down the company and use its facilities for storage. (Baldt, according to_Mr. McGinnis [sic], has no direct interest in the American Anchor & Chain Corp. except through McGinnis [sic], Linnenbank, and a few other employees who are officers of the corporation and are responsible for operating it.)
2. When questioned on all other contracts, Mr. Linnen-bank gave the following information:
25499 — Completed this week.
24914 & 26501 — They have resolved the difficulty and have started production and can perform.
I explained that these contracts are or would be delinquent and that an extension in delivery would be neces *30 sary. I requested a detailed letter quoting realistic delivery schedules which we would review and if acceptable would require a price reduction of 2% of the total contract price for every 30 days of delinquency. Mr. Linnenbank promised to write immediately.
A great deal of discussion centered around the hardship to the contractor if we terminate for default and that the employees of the contractor were incompetent and that should not cause the Corporation to suffer.
I explained that we would do everything possible to help but would not give up any of the Government’s rights in so doing. Further, they and only they were responsible for their employees. The individual who submitted the bids was authorized to secure business for the Corporation and if he lacked ability to do the job he should have been more closely supervised. In this respect Mr. McGinnis [sic] admitted laxity on their part. In any event the responsibility must rest with them and not the Government. I explained “Title II” relief and stated that none was available since prior to award of contracts 25122 and 25219 we asked that the price be verified, which it was.
35. (a) Plaintiff attempted to perform Suit Contract 25219 by purchasing silver brazing rings, and after Mr. Landauer’s departure from the plant the General Stores Supply Office informally received information from a company representative indicating dates of shipment.
(fo) The body of a letter dated March 6, 1957, addressed to defendant’s contracting officer from E. J. McGuiness, plaintiff’s executive vice president, reads as follows:
Subject: Contract N155-25219
Gentlemen:
Reference is made to recent conference in your office regarding subject contract, and we have exhausted every effort to subcontract parts involved.
We are hopeful that you have been able to develop a situation with your stock control that a contract cancellation would be in order and respectfully request your advice in this connection.
(c) Contract N155-25219, referred to in the above letter, is Suit Contract N155-25219.
36. The body of a letter dated March 8,1957, addressed to plaintiff from defendant’s contracting officer reads as follows:
*31 Su'bj: Termination No. 2082D
Contract: N155-25219
Eeqn: 155/103106F/56
Appn: 17X4911.20 NSF (Allotment 155/70000)
Exp. Acct. 51000
Total amount of contract $8171.70
Total amount terminated $8171.70
Gentlemen:
The subject contract awarded 7 September 1956_ provided that delivery of the material specified therein be made on or before 5 January 1957.
It is the decision of the Contracting. Officer that the delay in delivery has not been occasioned by causes beyond your control or without your fault or negligence. Accordingly, as a result of your default in performance and in exercise of the rights reserved to the Government under Paragraph (a) Section 11 of the General Provisions entitled “Default” you are hereby notified that effective 11 March 1957, all work under the subject contract shall be terminated and no further deliveries shall be made.
You are further notified that the Government intends to exercise its rights to repurchase the material from other sources and charge against your account any costs incurred.
37. The body of a letter dated March 22,1957, addressed to plaintiff from defendant’s contracting officer reads as follows:
Contract N155-25122 was terminated for default of the contractor by General Stores Supply Office Termination Number 2079D, dated 16 January 1957, in accordance with Section 11 of the General Provisions of said contract.
Following such termination, the Government, in accordance with its rights under Section 11, entered into a contract with another contractor to supply material covered by contract N155-25122. The cost to the Government of the material, procured under the replacement contract exceeds the price fixed for such articles under •the contract by $2,158.20, computed as follows:
Per Defaulted Contract Per Replacement Contract
Item Quantity unit Price Extension Unit Price Extension
5 8,400 each $.17 $1,428.00 $.298 $2,503.20
6 11,400 each .28 3,192.00 . 375 4,276.00
$4,620.00 $6,778.20
Less 4,620.00
Net Amount oí Excess cost to the Government_$2,158.20
*32 Under the terms of the contract, the contractor is liable to the Government for such excess cost incurred in the amount of $2,158.20 and demand for payment is hereby made. It is requested that payment by check to the order of the Treasurer of the United States be forwarded to the General Stores Supply Office, Attention Code 731/6, by 22 April 1957.
38. The body of a letter dated May 13, 1957, addressed to plaintiff from defendant’s contracting officer reads in part as follows:
Contract N155-25219 was terminated for default of the contractor by General Stores Supply Office Termination Number 2082D dated 8 March 1957, in accordance with Section 11 of the General Provisions entitled “Default”.
Following such termination, the Government, in accordance with its rights under paragraph (c) of said Section 11, entered into a contract with another contractor to supply the fittings covered by contract N155-25219. The cost to the Government of the fittings under the replacement contract exceeds the price fixed for such articles under the subject contract by $7735.12 computed as follows:
$ $ ‡ ‡
Under the terms of the subject contract, the contractor is liable for such excess costs incurred in the amount of $7735.12, and demand for payment is hereby made. It is requested that a check made payable to the Treasurer of the United States be forwarded to the General Stores Supply Office, Attention Code 731/8, by no later than 14 June 1957.
39. Under date of May 17, 1957, two letters were sent to defendant’s contracting officer from Mr. E. J. McGuiness, plaintiff’s executive vice president, as follows:
(a) A letter concerning Suit Contract N155-25122, the body of which reads:
Reference is made to your registered letter of March 22, concerning above subject and to our letter of April 16, petitioning for an appointment to discuss the assessment of termination charges. In this connection, we certainly appreciate our courteous reception in your office yesterday and regret exceedingly the necessity of such conferences.
*33 We trust that we hare made our position clear in that the items required by subject contract are entirely beyond the scope of our facilities, as we understand was pointed out by your Plant Facilities Inspector. Had the officers of the Company been aware of the actions being taken, we would not have bid in the first place and would certainly have withdrawn prior to a contract when the possibility of such withdrawal was pointed out by your people. Normal plant procedure in matters of this nature required our Works Manager to make his preliminary report and estimate to either the Executive Vice President or Vice President of the Company; and if deemed advisable, a bid would be submitted over the signature of a duly elected officer.
In the case at hand, however, the Works Manager, for reasons unknown, submitted a bid without the knowledge of any officer of the Company and withheld the information that the Navy had questioned both the prices and production facilities; and it was not until January 1957 that the information was available to the corporate officials, and shortly thereafter the Works Manager submitted his resignation.
As we advised in our letter of April 16, our present financial structure cannot bear the termination charges presently assessed on subject contract and other matters of a similar nature pending; and it is, therefore, respectfully requested that you advise appropriate steps that we should take to be relieved of the charges inasmuch as the Works Manager was not authorized to commit the corporation to this contract.
(b) A letter concerning Suit Contract N155-25219, the body of which is identical to the body of the foregoing letter concerning Suit Contract N155-25122.
40. The body of a letter dated October 21,1958, addressed to the U.S. General Accounting Office, Claims Division, Washington, D.C., from plaintiff’s executive vice president, Mr. E. J. McGuiness, reads as follows:
Reference is made to subject file and to conversation with Mr. E. N. Hall concerning money retained by the Government as termination charges against contracts, as shown below:
Contract Contract Amount Termination Charges
N155-25219 $8171.70 $7735.12
N155-25122 4620.00 2158.20
*34 In conversation with, and in letters to the Contracting Officer at General Stores Supply Office in Philadelphia, we believe we have made our position clear that the items required by subject contract were entirely beyond the scope of our facilities. We understand this situation was recognized by the Government Plant Facility Inspector and that he pointed this fact out to our then Works Manager, H. L. Landauer and so noted on his facility report. Information concerning negotiations leading up to and the actual acceptance of the contracts referred to were withheld from the corporate officers and it was not until January, 1957 that the matter came to light and shortly thereafter the Works Manager submitted his resignation. Normal plant procedure in matters of this nature required our Works Manager to make his preliminary report and estimate to either the Executive Vice President or Vice President of the company, and if deemed advisable a bid would be submitted over the signature of a duly elected officer.
It is, therefore, respectfully requested that you give consideration to the extenuating circumstances present in this case, as listed below, to the end that we be relieved of the charges assessed and monies withheld returned.
1. H. L. Landauer’s title as Works Manager did not authorize him to obligate the corporation in any matters beyond the limited scope of every day business.
2. It is our understanding that the bid list application on file at General Stores Supply Office names II. L. Landauer as the person authorized to sign bids and is signed by the same H. L. Landauer. We believe that the Contracting Officer was in error in accepting such an application and construing same as sufficient authority to bind a corporate body, when not an officer.
3. It is our understanding from conversation with the Plant Facility Inspector that he was cognizant of the fact that the items required were entirely beyond the scope of the plant facilities and that the prices were ridiculously low as compared with those normally paid for similar items by the Government. We believe that this information was incorporated in the Inspector’s report.
4. We contend that the Contracting Officer erred in awarding this contract at the ridiculously low *35 prices quoted when compared with the prices of other bidders on the invitations involved and previous prices at which the Government had purchased similar material and that this coupled with the negative report of the Facility Inspector, should have been sufficient for him to at least require proper corporate approval before awarding the contract involved.
It is our understanding that replacement material was purchased by the Government at approximately the same price as they would have expected to pay at the time contracts were entered into with us. We, therefore, respectfully request that the termination charges be reduced to the actual monetary loss suffered by the Government in entering into replacement Contracts N155-28573, N155-30044 and N155-30045, as compared with prices they would have expected to pay at time defaulted contracts were negotiated.
If you have any further questions or if we can supply any additional data to substantiate our position, please advise.
41. The body of a letter dated March 19, 1959, addressed to plaintiff from the Comptroller General of the United States reads as follows:
Further reference is made to your letter of October 21, 1958, requesting review of the action taken by this Office in applying funds otherwise due your firm in liquidation of its indebtedness to the United States in the amount of $9,893.32 arising from the default termination of contracts N155-25219 and N155-25122, with the Department of the Navy.
Contract N155-25122 awarded on September 14? 1956, delivery to be made by December 13,1956, was terminated for default on January 16,1957, in accordance with section 11 of the General Provisions of the contract. The cost to the Government for the materials procured under the replacement contract exceeded the price fixed for such articles under the original contract by $2,158.20.
Contract N155-25219, awarded on September 7, 1956, was similarly terminated for default on March 8, 1957. The cost to the Government for the pipe fittings under the replacement contract exceeded the price fixed for such articles under the original contract by $7,735.12.
*36 Your letter of October 21 requests that consideration be given to the following extenuating circumstances and that you be relieved of the charges assessed and the monies withheld returned. The reasons set forth in your letter are as follows:
“1. H. L. Landauer’s title as Works Manager did not authorize him to obligate the corporation in any matters beyond the limited scope of every day business.
“2. It is our understanding that the bid list application on file at General Stores Supply Office names H. L. Landauer as the person authorized to sign bids and is signed by the same H. L. Landauer. We believe that the Contracting Officer was in error in accepting such an application and construing same as sufficient authority to bind a corporate body, when not an officer.
“3. It is our understanding from conversation with the Plant Facility Inspector that he was cognizant of the fact that the items required were entirely beyond the scope of the plant facilities and that the prices were ridiculously low as compared with those normally paid for similar items by the Government. We believe that this information was incorporated in the Inspector’s report.
“4. We contend that the Contracting Officer erred in awarding this contract at the ridiculously low prices quoted when compared with the prices of other bidders on the invitations involved and previous prices at which the Government had purchased similar material and that this coupled with the negative report of the Facility Inspector, should have been sufficient for him to at least require proper corporate approval before awarding the contract involved.”
Regarding your first and second contentions the Department of the Navy, while admitting that the Bidders Mailing List Application and the bid were signed by Mr. H. L. Landauer, Works Manager, has taken the position that the officers permitted Mr. Landauer to exercise such full control over the corporate operations as to justify third parties dealing with the corporation in assuming that he was vested with authority to bind the corporation. The General Stores Supply Office *37 (G.S.S.O.), U.S. Navy, Philadelphia, Pennsylvania, has reported that there is on file at that office a memorandum reporting a conference between Lt. Shire, Contracting Officer, and Messrs. E. J. McGuiness, Linnenbank, and Money, of American Anchor and Chain Corp., held at the G.S.S.O. on February 12,1957. The conference was held for the purpose of discussing contracts N155-25219, N155-24914, N155-25499, N155r26501 and N155-25122. The following statement is quoted from the memorandum.
“The discussion began with an explanation as to why the above company was having difficulty in performing contracts, specifically contracts N155-25122 and N155-219, the former having been terminated for default. The works manager, Mr. Landauer, and another employee had been fired, apparently due to their incompetence in bidding on the two contracts plus other facts.”
The report from G.S.S.O. states that nothing was said, at that time, to indicate that Mr. Landauer did not have any authority to sign the bids. The record furnished also fails to show that there was any allegation that the corporate officers were without knowledge of the contracts in question or that they undertook to repudiate them promptly upon becoming aware of their existence.
In addition the report received from G.S.S.O. dated February 10, 1959, regarding your indebtedness under the two defaulted contracts states, in part, as follows:
“4. In addition to the copies of the documents which you requested in connection with the allegations in the contractor’s paragraph 4, there is forwarded a copy of the pre-award survey, referred to as a ‘report of the Facility Inspector.’ (Enclosure 6) The contractor was fully aware of the price differential. According to the report, the question was fully discussed with the bidder who said that any loss would be absorbed and that he declined to ask for the relief which might have been accorded him. Previous to the report of the Inspector, the buyer had received price confirmation by telephone, which was later confirmed by letter.
“5. Contrary to the statement made by the contractor in his paragraphs numbered 3 and 4, the Inspector reported that the machinery and facilities *38 of the contractor were adequate to perform within the required time.”
Our Office, having no firsthand knowledge of the facts, must necessarily rely on the report of the administrative office with respect to the factual situations pertaining to the contracts. In the absence of evidence sufficient to overcome the presumption of the correctness thereof, it is the invariable rule of the accounting officers of the Government to accept the statement of facts as reported by the administrative officers. On the present record, we feel that it may reasonably be inferred either that Mr. Landauer had implied authority to act in the premises or that his acts were ratified.
The action taken in charging you with the excess costs involved was taken pursuant to the contract terms, which provide that if the contractor fails to complete the work within the time specified the Government may terminate the right of the contractor to proceed and declare him in default, secure the work elsewhere, and charge the contractor with any resulting excess costs.
Accordingly, the action in applying funds otherwise due your corporation in liquidation of your indebtedness to the United States in the amount of $9,893.32 is sustained.
42. The testimony of Mr. Landauer, plaintiff’s works manager, and of Mr. Linnenbank, plaintiff’s vice president, is in conflict on the issue of whether Mr. Linnenbank gave prior approval to Mr. Landauer to sign the bids on the two Suit Contracts. At the trial both Mr. Landauer and Mr. Linnen-bank gave evidence of complete sincerity and integrity; hence, it is probable that the conflict in their testimony is a result of failure to remember or of a misunderstanding. Although no finding is made as to whether Mr. Landauer was given prior approval to sign the bids on the two Suit Contracts, it is found, based on the entire record of the case, that Mr. Landauer was given prior approval to bind plaintiff on contracts comparable to the Suit Contracts, that plaintiff at all relevant times clothed Mr. Landauer with an appearance of authority to bind plaintiff on the Suit Contracts, and that defendant relied in good faith on such appearance of authority in entering into the two Suit Contracts.
*39 CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is therefore dismissed.

 On December IP, 1956, Landauer wrote a letter of resignation, effective “on January 15, 1957, or sooner, whichever suits your convenience.”

 He took this stance because he believed that his actions were all approved or directed by the officers at Chester, but so far as the defendant was concerned he acted without indicating that his authority to deal was restricted.

 The two negotiated agreements contained formal certificates, executed by Linnenbank, that Landauer was the Works Manager and that the contract was duly signed for and on behalf of plaintiff by authority of its governing body and was within the scope of its corporate powers.

 In one of the contracts involved In this case, there were serious errors in the bid submitted by Landauer on behalf of plaintiff. The pre-award inspector for the Navy thought that because of these oversights the company would suffer a loss on the contract, but his report indicates that plaintiff (through Landauer) “was willing to absorb any loss in order to establish themselves as a supplier of this type material.” The inspector recommended that the bidder be required to reaffirm its bid price in writing and to post a performance bond. These recommendations were not followed (as they did not have to be), probably because Landauer had already written the Navy, a month earlier, that the company would supply the material (on which it had bid) “at price quoted.” These exchanges on the errors in the bid were all through Landauer. The flies of plaintiff’s plant at Eieldsboro were, of course, open to the executive officers (from Chester) but they apparently did not canvass them very thoroughly even though Linnenbank visited Eieldsboro about once a week.

 The printed form for negotiated contracts contains a form of certificate which must be completed if the contractor is a corporation. This printed certificate was filled in and signed for the two negotiated contracts made by plaintiff. See footnote 3, supra. The forms for bid contracts do not contain any such certificate or any form for evidencing an agent’s authority. This difference in the two forms is significant.

 The form for the Bidder’s Mailing List Application required that it “be presented and signed by the principal as distinguished from an agent, however constituted.” This requirement was fulfilled because plaintiff was designated as the applicant. There was no additional requirement of evidence of a corporate signer’s authority.

 In addition, very shortly after the two awards involved in this case (September 7 and 14, 1956), the contractor signed (on September 20, 1956) the first negotiated contract containing a certificate from Linnenbank that Lan-dauer, as Works Manager, was authorized to sign that contract. See footnotes 3 and 5, supra.