Per Curiam :
This case was referred to Trial Commissioner James F. Davis with directions to make findings of fact and *910 recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on August 31, 196?. Exceptions to the commissioner’s report and opinion were filed by defendant and the third-party plaintiff. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with a small modification, it hereby adopts the same, as modified, as the basis for its judgment in the case as hereinafter set forth. Therefore, the plaintiff, Fidelity and Deposit Company of Maryland, is entitled to recover and judgment is entered for said plaintiff in the sum of $74,191.67. The petition of the third-party plaintiff is dismissed.
Commissioner Davis’ opinion, with a small modification by the court, is as follows:
Plaintiff, Fidelity and Deposit Company of Maryland (hereinafter “Surety”), a Miller Act surety, claims $74,191.67 held by defendant United States pursuant to its contract with Atlantic Wharf Industries, Inc. (hereinafter “Contractor”), Surety’s principal. Mint Factors, Contractor’s assignee, entered the case as third-party plaintiff pursuant to Pule 23 and claims $55,000 plus interest of the monies held by defendant. Defendant admits it holds $74,191.67 as stakeholder, subject to pay out according to this court’s judgment.
The facts are as follows:
On February 19, 1963, Contractor entered into a master contract with the United States through the Department of the Navy for repair and alteration of vessels of the United States. Acting through the Department of Defense, the United States issued job orders on December 11, 1963 and March 5, 1964, for performance of alteration and repairs on, respectively, the U.S.S. Manma, Loa and the U.S.S. Tanner. Contractor and Surety entered into Miller Act suretyship agreements on the respective dates.
Contractor completed performance of the job order on the U.S.S. Manma Loa on March 16,1964, and on the U.S.S. Ta/nner May 21, 1964. However, at the time the U.S.S. Tanmer job was completed, i.e., May 21,1964, certain laborers *911 and materialmen had not been paid for work performed and materials supplied on both vessels as early as January 1964.
On June 12 and June 29,1964, Mint Factors loaned Contractor $40,000 and $15,000, respectively, part of which was used to pay laborers and materialmen for work done under the contract. As security for the loans, Contractor assigned to Mint Factors all sums due from the United States under the contract. The assignment complied with the Assignment of Claims Act.[1] No payments have been made on the loan and Mint Factors here claims $55,000 plus $4,000 interest.
Surety was notified as early as March and April, 1964 that Contractor was overdue in making payments to laborers and materialmen. On June 9, 1964, a written notice of nonpayment by Contractor was sent to Surety by Hose-McCann Corporation, one of Contractor’s suppliers of labor and materials, noting an unpaid balance of $89,199.
Beginning July 22, 1964, Surety, pursuant to its Miller Act payment bond, paid $311,318.91 to Contractor’s unpaid laborers and materialmen for the U.S.S. Tanner job. Likewise, beginning September 29, 1964, Surety paid $52,141.47 on the U.S.S. Maiwna Loa job.
Surety contends it is entitled to recover the entire sum held by defendant under the well-established principles stated in Henningsen v. U.S. Fid. & Guar. Co., 208 U.S. 404 (1908); Prairie State Bank v. United States, 164 U.S. 227 (1896), and Nat'l Sur. Corp. v. United States, 132 Ct. Cl. 724, 133 F. Supp. 381 (1955). Third-party plaintiff Mint Factors, on the other hand, argues that this is an “unusual and special” case and is “virtually identical” on the dispositive facts with Natl Union Fire Ins. Co. of Pittsburgh v. United States, 157 Ct. Cl. 696, 304 F. 2d 465 (1962), wherein an assignee was held entitled to recover certain funds claimed by a Miller Act surety. Essentially, Mint Factors’ position is that it, as assignee of Contractor, is entitled to recover since the contract balance held by defendant was earned by Contractor prior to default and prior to Surety’s payment of any *912 thing under its bond. Furthermore, Mint Factors argues that since Contractor used funds loaned by it to reduce the obligations under the contract, thereby reducing the payments Surety had to make under its bond, the doctrine of unjust enrichment should prevent double benefit to Surety.
Mint Factors’ position is not supported by either the law or the facts of this case. Nat'l Union Fire Ins. Co. held simply that a progress payment made by the United States to an assignee bank prior to default of the contractor could not be recovered by the surety upon later default by the contractor. Comparable facts do not exist here. None of the $74,191.67 held by the United States as stakeholder was ever sent to the assignee, Mint Factors.[2]
In any event, in this case, Contractor was in default at the time Mint Factors made its loans on June 12 and 29, 1964. Invoices dated January 1964 had not been paid by Contractor and one supplier was communicating with Surety on June 9,1964, concerning the unpaid account of Contractor. It is not necessary that there be a formal declaration of the contractor’s default. All that is necessary for the surety to prevail is that the contractor be in default as a matter of fact; and that as a result of such default, the surety has become obligated to pay under its payment or performance bond. The surety’s potential rights become an actuality when it pays the obligations of its principal. Thereupon, the surety’s rights of subrogation relate back to the date of the execution of the surety bonds. Prairie State Bank v. United States, supra; Nat’l. Sur. Corp. v. United States, supra. There is no problem in this case of notice to the Government, as was involved in Home Indemnity Co. v. United States, 180 Ct. Cl. 178, 876 F. 2d 890 (1967), and cases cited therein.
Mint Factors’ argument that Surety is unjustly enriched since the loan to Contractor reduced dollar for dollar the obligations of Surety is without merit. Such argument was rejected in Royal Indemnity Co., 178 Ct. Cl. 46, 371 F. 2d 462 *913 (1967), cert. denied, 389 U.S. 833.[3] In any event, Mint Factors’ argument of unjust enrichment is hardly persuasive in view of the fact that on July 17, 1964, after it had loaned Contractor $40,000, Contractor received a payment from the Government on account of work done under the contract in issue for $66,623.40, which payment was turned over to Mint Factors and applied by it toward another indebtedness of Contractor rather than toward the $40,000 loan. (See finding 16.)
Therefore, Surety is entitled to recover the balance of monies due held by defendant under well-established principles set out in Royal Indemnity Co., supra, and cases cited therein.
FINDINGS OF FACT
1. Plaintiff, Fidelity and Deposit Company of Maryland, is a Maryland corporation, with its main office in the city of Baltimore, Maryland, and at all times material was qualified to act as a surety under the provisions of the Miller Act (40 U.S.C. §270a).
2. Pursuant to motion filed by plaintiff under Pule 23, a third-party notice was issued to and served upon Mint Factors, which thereupon filed a petition claiming an interest in the subject matter of the suit. Mint Factors is a partnership composed of Charlotte and Lee R. Mintz, with its principal office and place of business in New York City. It is a financing institution under the laws of New York, and finances contracts and accounts receivable and makes loans. It is authorized to receive and accept assignments under the Assignment of Claims Act of 1940, as amended (31 U.S.C. §203).
3. Atlantic Wharf Industries, Inc., the contractor, is a New York corporation, previously having its office and principal place of business at the foot of Wolcott Street in Brooklyn, New York. It has now ceased to do business. Pursuant to plaintiff’s motion under Rule 23 (finding 2), notice was served on Atlantic Wharf Industries on December 2, 1965. No appearance was made for, or in behalf of, Atlantic Wharf Industries and the time for doing so has now expired.
*914 4. Notices to third parties pursuant to Rule 23 were also served on the Attorney General, State of New York, and Corporation Counsel, City of New York. Neither appeared to assert any claim or interest in the subject matter of this suit and the time for doing so has now expired.
5. Defendant United States is only a stakeholder in this case, was not represented at the trial, and has agreed to pay out monies due in accordance with the judgment of this court. (See finding 19.)
6. This litigation arose as follows: Atlantic Wharf Industries entered into a master contract with the United States through the Department of the Navy for the repair and alteration of vessels of the United States. The contract, designated as NOBs 41261, is dated February 19, 1963.
7. Pursuant to the terms of the master contract, the United States, about December 11,1963, acting through the Department of Defense, issued job order No. 8898-B for the performance of alteration and repairs for all items and specifications with addenda for the U.S.S. Manma Loa. Plaintiff, at the request of Atlantic Wharf Industries, issued to the United States as surety for Atlantic Wharf Industries, as principal, performance and payment bonds upon Standard Forms 25 and 25A, each in the amount of $349,000, to secure the performance of the job order and payment to all persons furnishing labor and material in connection therewith.
8. About March 5, 1964, the United States, again acting through the Department of Defense, issued job order No. 1234-B pursuant to the same master contract. That job order was for all items and specifications with addenda for the alteration and repair of the U.S.S. Tanner. Plaintiff, as surety, issued its bonds on behalf of Atlantic Wharf Industries, as principal. The 'bonds were on Standard Forms 25 and 25A and were conditioned for the performance of the job order and payment to all persons furnishing labor and material thereunder. Each bond was in the penal sum of $297,000.
9. Atlantic Wharf Industries satisfactorily completed the performance of work required under each job order and the work was accepted by the United States for the respective job orders on the following dates:
*915 (a) U.S.S. Mmma,Loa, Job Order 8898-B, March 16,1964.
(b) U.S.S. Tanner, Job Order 1234-B, May 21,1964.
10. On December 20, 1962, and prior to the execution by plaintiff of the bonds 'hereinabove referred to, Atlantic Wharf Industries entered into an agreement of indemnity with the plaintiff whereby, in consideration of the execution of such bonds, it agreed:
_ SECOND: That we, the Contractor (and the Indem-nitors, if any), will at all times indemnify and save the Company harmless from and against any and all loss, cost, claim, demand, liability and expenses of whatever kind or nature which it shall at any time sustain, incur, or be put to, for, by reason, or in consequence of “Such Bonds”, which have been or may hereafter be executed or procured on behalf of the Contractor, including all costs, counsel fees and expenses incurred in investigating any claims made under or concerning “Such Bonds”, or in collecting any premiums due or losses sustained on “Such Bonds”, or m or about prosecuting or defending any actions, suits, or other proceedings which may be commenced or prosecuted against the Contractor, or against the Company, upon “Such Bonds”, or in anywise relating thereto; we, the Contractor (and the Indemni-tors, if any), further agreeing, that in any accounting which may be had between the Company and the Contractor, or between the Company and the Indemnitors, or either or both of them, the Company shall be entitled to charge for any and all disbursements made by it in food faith in and about the matters herein contemplated _ y this Agreement of Indemnity, under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Company shall be prima facie evidence of the fact and amount of our liability to the Company.
It was further agreed:
FIFTH: That the Contractor (Indemnitors, if any, consenting) will assign, transfer and set over, and does hereby assign, transfer and set over to the Company, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement of Indemnity and any other indebtedness and liabilities of the Contractor to the Company, whether heretofore or hereafter in *916 curred, the assignment in the case of each contract to become effective as of the date of the bond guaranteeing the performance of such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in “Such Bonds” or of any breach of any “Such Bonds”; or (2) of any breach of the agreements contained in any of the paragraphs of this Agreement of Indemnity; or (3) of a default in discharging such other indebtedness or liabilities when due; or (1) of any assignment by the Contractor for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor, whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (a) of this paragraph; or (6) of the Contractor’s dying, absconding, becoming a fugitive from justice, or being convicted of a felony, if the Contractor be an individual: (a) All the right, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in “Such Bonds”, and in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in “Such Bonds” or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in “Such Bonds”, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (b) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in “Such Bonds”, or in, or growing in any manner out of, “Such Bonds”, or any of them; (c) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or material-man, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in “Such Bonds”; (d) Any and all percentages retained on account of any and all contracts referred to in “Such Bonds”, and any and all sums that may be due under any and all contracts referred to in “Such Bonds” at the time of any abandonment, forfeiture or breach, or that thereafter may become due.
*917 11. (a) Although. Atlantic Wharf Industries had satisfactorily completed performance under both above-noted job orders (finding 9) by May 21, 1964, there were at that time outstanding claims of persons who furnished labor and materials. Invoices dated as early as January 1964, payable in 30 days, remained unpaid. Plaintiff received notice of late payments as early as March and April, 1964. On June 9, 1964, plaintiff received written notice of nonpayment by Atlantic Wharf Industries of an unpaid balance owed to Hose-McCann Corporation, one of Atlantic Wharf Industries’ suppliers of labor and materials.
(b) On about July 15, 1964, Atlantic Wharf Industries furnished plaintiff a list of subcontractors and suppliers with claimed amounts owing to them for labor and material furnished in connection with work on each vessel. Each claim was investigated and verified by plaintiff and paid.
(c) The total amount paid to furnishers of labor and material to the U.S.S. Mawna Loa job was $52,141.47. The first payment was made September 29, 1964, and the last March 9,1965.
(d) Plaintiff similarly paid claims for labor and material furnished for use in the repair and alteration of the U.S.S. Tann&r. Total claims so paid were $311,318.91. Payments were made between July 22, 1964 and March 24, 1965.
12. Plaintiff received assignments of claims from all persons and companies it paid. No repayment or other reimbursement has been made to plaintiff.
13. A copy of the indemnity agreement (noted in finding-10) was served on the United States about July 22, 1964. At the same time, plaintiff notified defendant in writing that claims were being made against it by furnishers of labor and material and that it would make payment of the same.
14. (a) On June 12, 1964, third-party plaintiff Mint Factors loaned Atlantic Wharf Industries $40,000. On June 29, 1964, Mint Factors loaned Atlantic Wharf Industries a further sum of $15,000. Both loans were for 30 days and were deposited in the account of Atlantic Wharf Industries in the First National City Bank of New York, New York. No part of the $55,000 loaned has been paid to third-party plaintiff.
*918 (b) In consideration for the loans totaling $55,000 above noted, Mint Factors received two assignments from Atlantic Wharf Industries, dated respectively June 12 and June 29, 1964, by which were assigned to Mint Factors monies due from the U. S. Navy on account of work completed by Atlantic Wharf Industries on the U.S.S. Tam/ner and U.S.S. Mamut Loa.
15. The assignments (finding 14) were re-executed by Atlantic Wharf Industries on July 15,1964, and notice thereof mailed by Mint Factors to the United States Regional Finance Center, Brooklyn, New York, on July 17, 1964, in accordance with the Assignment of Claims Act of 1940, as amended (81 U.S.C. § 203). Receipt was acknowledged by the Center at 10 a.m., July 24, 1964. Copies of the assignments were also sent to plaintiff by Mint Factors on July 15,1964.
16. By check dated July 17,1964, the U.S. Navy paid Atlantic Wharf Industries $66,623.40 for work done under the contract in suit. The check was endorsed by Atlantic Wharf Industries, turned over to third-party plaintiff Mint Factors, and deposited to Mint Factors’ account with Bankers Trust Company, New York, New York, on July 20,1964. The proceeds were applied by Mint Factors toward an indebtedness of about $100,000 of Complete Maintenance and Repair Corporation. Atlantic Wharf Industries was a guarantor of the Complete Maintenance and Repair Corporation obligation.
17. (a) Part of the $5.5,000 loaned to Atlantic Wharf Industries by third-party plaintiff Mint Factors was used to jpay obligations for labor and material incurred in work on the U.S.S. Tornner and the U.S.S. Mav/na Loa. Checks, listed below, issued by Atlantic Wharf Industries subsequent to June 9, 1964 (three days prior to Mint Factors’ first loan), were in payment for labor or materials for one of the two vessels:

Check No. Date Payee Amov/at Ship

1295 June 9 Le Gault_ $1,000.00 Tanner.
1304 June 16 LeGault_____ 1, 600.00 Tanner.
1299 June 12 Frank R. Oaponl, Coppersmith. 1,000.00 Mauna Loa.
1300 June 12 H «fe S Valve Service Corp_ 510.00 Mauna Loa.
1301 June 12 H <& S Valve Service Corp_ 460.00 Tanner.
1285 June 12 Colony Metal Corp_ 500.00 Tanner.
1302 June 15 Colony Metal Corp___ 1,000.00 Tanner.
1308 June 18 John W. Wallace & Co_ 500.00 Mauna Loa.
1312 June 19 FigliBros_ 225.60 Mauna Loa.
1321 July 9 Treasurer of United States__ 6.40 Tanner.
*919 (b)Other payments were made subsequent to June 12, 1964, by Atlantic Wharf Industries to persons identified as subcontractors or material suppliers, but there is no proof on what account the payments were made. Atlantic Wharf Industries had also repaired a Navy ship and a MSTS ship shortly before this period. Among the items paid, but without indication to which ship or ships the labor or material furnished had been put, were the following:

Check No. Date Payee Amount

1308 June 16 Mayer Malbin Co.. $642.03
1309 June 19 Reale Paint Co..... 270.86
1311 June 19 Evans Air Products Ino __ — .. 361.83
1316 July 2 Martin Buck. 200.00
1287 June 4 Treasurer of U.S. 1,365.00
1320 July 2 Treasurer of tT.S.. 52.50
(c) Other payments made by Atlantic Wharf Industries subsequent to June 12,1964, were for obligations of a general character such as normal overhead and operating expenses. A payment of $1,175.12, by check dated June 29,1964, to the New York Telephone Company, represented payment for charges for both office and pier telephone service.
(d) Wolcott Maintenance and Eepair Corporation, a wholly owned subsidiary of Atlantic Wharf Industries, was the lessor of the pier at which Atlantic Wharf Industries operated. Atlantic Wharf Industries made the following payments to W olcott:

Check No. Pate Arnomt

2481 June 16, 1964. $420
2484 June 15, 1964. 3,315
2496 June 30,1964. 2,285
2610 July 14, 1964. 4,240
18. The same personnel operated the business of both Atlantic Wharf Industries and its subsidiary, Wolcott Maintenance and Eepair Corporation. Wolcott made several payments after June 12, 1964, relating to the business of Atlantic Wharf Industries, only one of which is directly attributable to labor or materials furnished for the contract in suit. Such payment was to Consolidated Edison Company for $3,359.95, on June 15,1964, for electrical power for work on the TT.S.S. Tamper.
*920 19. After completion of the work required under both job orders noted in finding 9, there remained due Atlantic Wharf Industries from defendant, $82,905.50. However, the parties have stipulated that Atlantic Wharf Industries owed defendant $8,713.88 for certain supplies and parts, which when offset against the monies due, leaves a balance of $74,191.67. Defendant agrees to pay out such sum in accordance with the judgment of this court.
20. Plaintiff asserts a claim to the entire sum of $74,191.67 held by defendant as stakeholder.
21. Third-party plaintiff Mint Factors asserts a claim to $59,000, comprised of $55,000 principal on its loan, plus $4,000 interest computed at 6 percent.
22. Atlantic Wharf Industries does not claim any part of the money held by defendant as stakeholder.
CONCLUSION or Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff, Fidelity and Deposit Company of Maryland, is entitled to recover and it is therefore adjudged and ordered that the Fidelity and Deposit Company of Maryland recover of and from the United States the sum of $74,191.67.
The petition of the third-party plaintiff is dismissed.

 31 U.S.C. § 203 (1964), as modified by 65 Stat. 41 (1951), 41 U.S.C. § 15 (1964).

 In Nat’l Union Fire Ins. Co., the Government became a stakeholder of the disputed sum by reason of a state court Injunction preventing the assignee from collecting on the Government check. However, the court treated the case on the law as if the assignee had been paid. This is clear from the fact that the cases cited and relied on by the court all involved suits by a surety against an assignee to recover payments allegedly made erroneously by the Government.

 See “Third Party’s Opposition to Plaintiff’s Motion for Summary Judgment,” filed April 20, 1966, p. 14, in Royal Indemnity Co.