**GREAT AMERICAN INSURANCE COMPANY**

v.

**The UNITED STATES, and Bank of America National Trust and Savings Association, Third-Party Defendant.**

**No. 249-67.**

United States Court of Claims.

July 13, 1973.

Edward Gallagher, Washington, D. C., attorney of record, for plaintiff.

Leslie H. Wiesenfelder, with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Edgar H. Brenner, Washington, D. C., attorney of record, for third-party defendant. James A. Dobkin and Arnold & Porter, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on exceptions by the third-party defendant to a recommended decision filed January 18, 1973, by Trial Commissioner Louis Spector pursuant to Rule 134(h). No exceptions were filed by defendant. The court has considered the case on the briefs and oral argument of counsel for plaintiff and the third-party defendant. Since the court agrees with the trial commissioner's decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover the

contract balance in the sum of $52,000.-74 and judgment is accordingly entered for plaintiff in that amount.

### OPINION OF COMMISSIONER

SPECTOR, Commissioner:

This case has been before the court on two prior occasions, and is now ripe for decision on the merits. The first opinion [1] was occasioned by motion of the third party defendant, Bank of America (hereinafter the Bank), to dismiss or stay proceedings as to it on the ground that the court lacked jurisdiction to summon the Bank to appear and assert and defend its interest in the suit.[2] The motion was denied in an opinion which affords a prelude for this consideration on the merits. In its opinion the court set forth certain "facts essential to the disposition of the motion [which] are not in dispute." This recitation of the facts has been confirmed by the trial which followed. They are hereinafter quoted from that opinion in the interest of continuity, and because defendant's brief now appears in some minor instances to disavow them.

In January 1956 [1965], a joint venture known as "James L. Wennermark d/b/a Wennermark Co. & Emmett J. Harris" contracted with the Department of the Interior for construction work on a levee extension. Plaintiff was the Miller Act (40 U.S. C. § 270a et seq. (1964))[3] surety for the joint venture, and when it defaulted on the contract on July 29, 1965, plaintiff effected the completion of the contract work as required by its bond.

The present dispute centers around a check for $52,000.74 issued by defendant on June 7, 1965, payable to

---

1. 397 F.2d 289, 184 Ct.Cl. 520 (1968).

2. The Bank had been summoned by the plaintiff.

3. Under the Miller Act, the Government has long required its construction contractors to furnish performance and payment bonds insuring their responsibility,

their ability to perform, and their payment of laborers, materialmen and suppliers (who are not otherwise permitted to file liens on Government projects). The sureties providing the bonds under the Act are selected from an approved list published by the U. S. Treasury Department.

the order of the joint venture in the name "Wennermark Co. and Emmett J. Harris," in partial payment of work performed on the contract.[4] The check was endorsed and negotiated at the Highland Branch of the Bank of America, San Bernardino, California. *Precisely who endorsed the check, who negotiated it at the bank, and what authority he had to do so, are among the key factual issues which are to be decided later and are not now before us.* [Emphasis supplied.] [5]

On June 17, 1965, at the request of the joint venture and the attorney for plaintiff, the Treasurer of the United States ordered payment stopped on the check. When the Bank forwarded the check for payment, it was returned with a notation that payment had been stopped at the request of the joint venture. On July 7, 1965, the joint venture filed a claim against defendant for the proceeds of the check. On August 3, 1965, subsequent to the default of the joint venture on its contract,[6] Emmett J. Harris executed an assignment of his interest in the proceeds of the check to plaintiff. On April 12, 1967, James L. Wennermark, on behalf of Wennermark Company and Emmett J. Harris assigned to plaintiff all right, title and interest in any claims they might have against E. F. Wennermark and his wife arising out of the check of $52,000.74, which check, according to the assignment, had been wrongfully and without authority converted and the proceeds disposed of by E. F. Wennermark and his wife.[7]

On October 22, 1965, Bank of America wrote to the Treasurer of the United States requesting that payment of the proceeds of the check be made to it. The Treasury Department replied that the check would not be paid until a court of competent jurisdiction made a determination "establishing the party entitled."

Plaintiff sued the defendant in this court, alleging that as the contractor's surety, it had completed the contract and paid the creditors of the joint venture pursuant to the surety's performance and payment bond at a total expense of $91,319.16.[8] Plaintiff further alleges that it thereby acquired equitable rights to the $52,000.74 held by the defendant as the unpaid balance due on the contract, and that plaintiff's rights to the fund are superior to the rights of any other party. * * * We hold that our jurisdiction extends to the claim asserted by plaintiff against defendant and, further, that we have jurisdiction to determine *whether the plaintiff or the Bank is entitled to recover the contract balance now held by the defendant.*

---

4. This payment is often referred to in the record as the fifth progress (or partial) payment. There is no question that the work represented by the check was satisfactorily performed, and that the payment was, and still is, due and owing for performance of the work represented thereby.

5. They are the issues dealt with in this opinion.

6. The record illustrates that the joint venture was financially unable to proceed when it did not receive the proceeds of the check.

7. As will appear later in this opinion, the findings in this case confirm that E. F. Wennermark did in fact wrongfully and without authority convert and dispose of the proceeds of the check.

8. Actually plaintiff-surety did not in its own name complete the contract. That would have required a formal novation agreement substituting it for the contractor. Rather, as the findings demonstrate, it financed the contractor to completion, an informal fulfillment of its bonding obligation often employed as an alternative to a formal novation agreement, or default termination of the contract followed by substitution of another contractor. The findings support a conclusion that the plaintiff advanced sums greatly in excess of the check here in issue to assure contract completion, rendering it unnecessary to determine the exact sum advanced.

\* \* \* Plaintiff's petition plainly states a cause of action for recovery of *a contract balance now held by the Government in a stakeholder capacity.* \* \* \* [Emphasis supplied.] [9]

The second occasion on which this case was before the court followed the Bank's motion and plaintiff's cross-motion for summary judgment. Following oral argument, the court found "that there are material issues of fact with respect to the liability of defendant to plaintiff or the third party and with respect to whether plaintiff or the third party has a superior right to the fund held by defendant." The motions were denied and the case "remanded to the trial commissioner for trial or other disposition of all issues of fact, including the amount, if any, which plaintiff or the third party is entitled to recover \* \* \*." [10]

The facts upon which these issues hinge are as follows: One of the two joint venturers (James L. Wennermark d/b/a Wennermark Company) had a confused and obscure background. In 1960 or 1961, James L. (Leroy) Wennermark, in his own name, applied for and was issued a State of California contractor's license to do business as Wennermark Company. During this same period, James L. Wennermark executed a general power of attorney to his father, Elmer Floyd Wennermark, which authorized E. F. Wennermark, among other things, "to make, do, and transact all and every kind of business of what nature or kind soever" in James L. Wennermark's name. At the time of the trial, James L. Wennermark had no personal independent recollection of having signed the power of attorney. Only after much hesitation did he identify the signature on the power of attorney as his own. There is no reliable proof that the power of attorney was ever placed on file with any third party.

The elder Wennermark, E. F. Wennermark, was sometimes known as "Jim" Wennermark by his friends and associates. He was not, however, ever known as "James L. Wennermark." E. F. Wennermark obtained the power of attorney from his son because he had been adjudicated a bankrupt in 1951 or 1952 and, in the State of California, this barred him from procuring a license to engage in the construction business.

James L. Wennermark first became associated in business with his father in January 1962 when he went to work for a joint venture comprised of the Wennermark Company and one Ralph B. Slaughter. Later, in December 1964, the joint venture involved in this case was formed and designated Wennermark Company & Emmett J. Harris. No written joint venture agreement was offered in evidence. No reliable testimony was given as to the terms of the agreement, other than the testimony of Emmett Harris that "[w]e had something we put down in writing, what each piece of equipment would receive per month for the job." E. F. Wennermark negotiated the joint venture agreement with Emmett Harris. At the time of the formation of the joint venture, Harris believed the elder Wennermark to be the owner of Wennermark Company, and only subsequently did Harris learn that the company's license to do business was in the younger Wennermark's name, *i. e.,* James L. Wennermark d/b/a Wennermark Company.

Both Emmett Harris and E. F. Wennermark contributed $1,000 or $2,000 to the joint venture. In addition, Harris contributed several trucks and a bulldozer, and E. F. Wennermark contributed a loader and bulldozer. Insofar as can be determined, the profits of the joint venture were to be shared 50 percent each between Emmett Harris and E. F. Wennermark. James L. Wennermark

---

9. 397 F.2d at 290–291, 184 Ct.Cl. at 522–524. The quoted opinion is emphasized at this point only because defendant's cur-rent counsel disputes in her brief that the Government's role is that of a stakeholder.

10. Order filed April 15, 1971.

did not directly share in the profits or losses of the business. According to the testimony, the younger Wennermark was "paid on different methods at different times." He "generally drew—took a draw against the company."

The joint venture bid on the Government contract here involved was signed "James L. Wennermark" by E. F. Wennermark. A bid supplement was also submitted and signed "James L. Wennermark-(Partner)" by E. F. Wennermark. The bid bond submitted with the bid was signed by both E. F. Wennermark and Emmett J. Harris, the elder Wennermark signing the name "James L. Wennermark." Harris and the elder Wennermark had apparently prepared the bid. The contract with the Department of the Interior was executed for the joint venture by E. F. Wennermark, signing "James L. Wennermark, Partner." E. F. Wennermark also signed the name "James L. Wennermark" to the performance bond and to the payment bond.

However, E. F. Wennermark's responsibilities with respect to the joint venture of Wennermark Company & Emmett J. Harris, and specifically with respect to this contract, appear to have been ministerial in nature for the most part. 'Any activity on the part of E. F. Wennermark during contract performance was largely confined to the joint venture office in San Bernardino. Even this activity was of a limited nature. The office work was performed by the joint venture secretary, Mrs. Norma Miller. She did all the bookkeeping, made out the payroll checks and accounts payable, handcarried and deposited the first four progress payment checks in the joint venture checking account, and performed all the general secretarial activities for the joint venture. The elder Wennermark's responsibilities at the office were largely confined to opening the mail and handing the bills to Mrs. Miller for filing and payment. The elder Wennermark was absent from the joint venture office 2 or 3 days a week; his absences were unexplained

and his whereabouts during these periods unknown. It also appears from the testimony that the elder Wennermark performed the ministerial act of signing the name "James L. Wennermark" as drawee to joint venture checks and to the first, second, third, and fifth "Contract Summary (Construction) and Voucher."

The record does reveal, on the other hand, that the elder Wennermark did arrange two loans from the Security First National Bank to the joint venture. Promissory notes were executed in conjunction with the loans. One note dated May 14, 1965, in the name of "WENNERMARK & HARRIS (a joint venture)" was signed by E. F. Wennermark in the name "James Wennermark, J. V. Partner." Another note executed May 24, 1965, in the name of "WENNERMARK CO. AND HARIS [sic], a Joint Venture" was signed "James L. Wennermark" by E. F. Wennermark. A third loan, unrelated to the other two, and issued to Wennermark Company alone, was evidenced by a note dated May 14, 1965, and signed "James L. Wennermark" by E. F. Wennermark.

In connection with the two aforementioned loans to the joint venture, a "Certification of Partnership" was executed on May 15, 1965, by Emmett J. Harris and E. F. Wennermark, the latter signing the name of his son, James L. Wennermark. The certificate provided in part:

> The undersigned, *James L. Wennermark* and Emmett J. Harris, hereby certify:
>
> 1. That they are *all of the general partners of Wennermark Company & Emmett J. Harris—joint venture,* a partnership existing under the laws of the State of California, and that there are no limited partners. [Emphasis supplied.]

Also in connection with those loans, and any future loans to the joint venture, Emmett J. Harris executed a continuing personal guarantee, pledging his person-

al credit for loans made to the joint venture.

Harris and the younger Wennermark conducted the actual field operations required for contract performance. The location of the work was partly in California where the rock to build the levee was blasted and loaded onto trucks, and partly in Arizona where the rock was put in place. Emmett Harris handled the quarrying end of the work in the field, which included supervision of the drilling, shooting, loading, and hauling. The younger Wennermark was in charge of the portion of the field work in Yuma, Arizona. He supervised the placing of the rock at the levee. Harris and the younger Wennermark both purchased materials and supplies and contracted for repair work when needed on the equipment. Both procured rental equipment when needed. Bills for supplies were approved by either the younger Wennermark or Harris prior to payment. The younger Wennermark prepared the payrolls for transmission to the joint venture office in San Bernardino, California. The younger Wennermark hired new men when they were needed. The younger Wennermark and Emmett Harris prepared the detail for the "Contract Summary (Construction) and Voucher" forms which served as the basis for progress payment checks of the type involved in this case. The Government's construction engineer testified that he also dealt with E. F. Wennermark on occasion.

The joint venture of Wennermark Company & Emmett J. Harris maintained its checking account at the Security First National Bank in San Bernadino, California. There was no joint venture account at the Bank of America, Highland Branch (the third party herein) where the check involved in this litigation was endorsed and negotiated. The Wennermark Company, one of the joint venturers, did maintain a checking account at the Bank of America, Highland Branch.

The signature card of the joint venture checking account at Security First National was signed both by Emmett J. Harris and E. F. Wennermark, the latter signing the name "James L. Wennermark." The signature card read as follows:

> The undersigned *are all of the general partners of the business known as Wennermark & Harris* under which name the bank account represented by this signature card is maintained. The undersigned hereby authorize *James L. Wennermark* and *Emmett J. Harris,* whose signatures appear on the reverse hereof, *any two acting together,* to make withdrawals from said account and to endorse for encashment checks and other items payable to or belonging to said business. * * * [Emphasis supplied.]

To make withdrawals from the joint venture checking account at Security First National, E. F. Wennermark would sign the name "James L. Wennermark." To make withdrawals from and deposits to the separate Wennermark Company account at the Bank of America, Highland Branch, the elder Wennermark would sign his own name, "E. F. Wennermark." He admitted that the agreement between the parties required cosignatures on all checks drawn on the joint venture account. Emmett Harris had insisted upon this arrangement as the result of prior dealings with the elder Wennermark.

The first five progress payment checks to the joint venture "Wennermark Co. and Emmett J. Harris" for work performed on this contract were mailed directly to the joint venture office at 481 Church Street, San Bernardino, California. The first progress payment check in the amount of $42,840 bears a typed endorsement by Mrs. Norma Miller as follows:

> Pay to the Order of
> Security 1st Nat'l Bank
> Highland & Wall Branch
> San Bernardino, Calif.
>     For Deposit Only
> Wennermark & Harris

The second progress payment check in the amount of $15,073.20 bears a typed endorsement by Mrs. Miller as follows:

> Pay to the Order of
> Security 1st Nat'l Bank
> Highland & Wall
> San Bernardino, Calif.
> For Deposit Only

The third progress payment check in the amount of $22,714.56 bears an endorsement in longhand as follows:

> For Deposit Only
> Wennermark & Harris
> Security 1st Nat'l
> Highland—Wall
> San Bdno, Calif.

The endorser is not identified. The fourth progress payment check in the amount of $33,402.78 bears a stamped and typed endorsement as follows:

> [stamped] Security First National Bank
> Highland Wall Branch
> For Deposit Only
> Wennermark Company
> [typed] Emmett J. Harris

The fifth progress payment check, the one involved in this litigation, in the amount of $52,000.74, bears the following endorsements:

> [longhand] Emmett J. Harris
> San Bernardino, California
> Wennermark Company
> [typed] Wennermark Co. & Emmet J. Harris [sic]
> For Deposit Only
> Bank of America
> Highland Branch
> [longhand] James L. Wennermark

Facts relating to the path of this check are hereinafter set forth in some detail, since they are at the very core of this litigation. Bearing No. 54,265,441, symbol 3120, the check was issued by the Government on June 7, 1965, and arrived at the joint venture office in San Bernardino shortly after 9 a. m., on June 9, 1965. Mrs. Miller was then alone in the office. Several minutes later E. F. Wennermark arrived and Mrs. Miller handed the check to him. The elder Wennermark instructed Mrs. Miller to type the endorsement quoted above as "typed." He cautioned her to tell no one, including Emmett Harris, that the check had arrived. Harris entered the office shortly thereafter at 9:30 a. m. After a brief conversation with Harris, E. F. Wennermark departed with the check. Harris was not told of the check's arrival.

The elder Wennermark went to the Bank of America (Highland Branch) and arrived at approximately 10 a. m. At the third party Bank, E. F. Wennermark proffered the check with the typed endorsement to the teller, a Mrs. Luella Elaine Barnes, for deposit in the checking account of the Wennermark Company.[11] Mrs. Barnes advised the elder Wennermark that the check was not properly endorsed since it was only typewritten, whereupon in the presence of Mrs. Barnes, E. F. Wennermark endorsed the name "James L. Wennermark" on the back of the check below the typed endorsement.

Mrs. Barnes, nevertheless, again refused the check, indicating that the signature of the other payee,[12] Emmett J. Harris, was required. Mrs. Barnes further told the elder Wennermark that Harris did not have an account at the Bank of America, Highland Branch, and that accordingly the procedure was that he (Harris) should come to the Bank, endorse the check in front of the teller, and present his identification. The elder Wennermark insisted that the check be accepted for deposit. Mrs. Barnes sought to refer the matter to an officer of the Bank but found that they were all outdoors on an adjacent parking lot which was then in the process of being paved. She placed the check to one side and did not include it in her work. The elder Wennermark left the Bank without

---

11. It will be recalled that the joint venture had its account not at this Bank, but at Security First National.

12. The other joint venturer.

the check, pending scrutiny by a Bank officer.

When an officer of the Bank returned, Mrs. Barnes explained the matter. The officer agreed that the Bank could not accept the check as endorsed. At approximately 1 p. m., Mrs. Barnes called the joint venture office and spoke to Mrs. Miller, informing her that the $52,000.74 check received that morning for deposit to the checking account of Wennermark Company, was not properly endorsed and that someone must come to the Bank to pick it up.

Around 2 p. m., the elder Wennermark returned to the joint venture office, having lunched with Emmett J. Harris, still without mentioning the check to him. Mrs. Miller communicated the Bank's message to Wennermark, Sr., and he said: "I'd better go get that check." When E. F. Wennermark returned to the teller's window, Mrs. Barnes called Mr. Kusick, an officer of the Bank, who returned the check to E. F. Wennermark with the explanation that the Bank would need the signature of Mr. Harris. The elder Wennermark stated: "There will be no problem. I will call him on my car phone." Within minutes, Mrs. Miller received a call from E. F. Wennermark from his car telephone. He asked her to meet him at Baseline and "D" Streets, refusing to tell her why, but emphasizing that he had something for her to do.

Mrs. Miller found the elder Wennermark in his car at Baseline and "D" Streets. He then handed her the check and bankbook. Instructing her to deposit the check in the Wennermark Company account, the elder Wennermark told Mrs. Miller to "wait a few minutes before you do, because they think I came to the office for Harris to sign it." Mrs. Miller waited, and then went into the bank. She noticed at this time that *two* signatures in longhand appeared on

the back of the check (those of Emmett J. Harris and James L. Wennermark) in addition to the endorsement which she had previously typed. Mrs. Barnes accepted the check for deposit to the account of Wennermark Company.[13] She first obtained the Bank manager's (Don Hiltabidel) initials on the deposit slip before accepting the check. Mrs. Miller then returned the deposit slip and bankbook to the elder Wennermark. E. F. Wennermark was not seen in the joint venture office, or on the job, subsequent to this check transaction.

E. F. Wennermark admits that he signed both the names "James L. Wennermark" and "Emmett J. Harris" on the check. Moreover, James L. Wennermark stated at the trial that the endorsement of his name on the check was not made with his consent, and that he did not authorize his father specifically to endorse the check. Emmett Harris testified at trial that he never, directly or indirectly, authorized the elder Wennermark to sign his (Harris') name to the check. The record in this case is devoid of any evidence indicating that by his own hand, E. F. Wennermark had ever previously endorsed a progress payment check such as the one involved in this case. The record is also devoid of any evidence that E. F. Wennermark on any occasion had ever signed the name "Emmett J. Harris" to any joint venture document or paper.

On the day following the above-described events, June 10, 1965, E. F. Wennermark drew a check in the amount of $45,000 on the *Wennermark Company* account at the Bank of America, Highland Branch. He had the check made payable to himself, and deposited it in a bank account in his own name in Las Vegas, Nevada. Several days thereafter, he drew a check for $45,000 upon the Las Vegas account and deposited it in a new personal account in a branch of

13. Note that Mrs. Barnes had previously advised the elder Wennermark that since Harris had no account at the Bank, procedure required that he come to the Bank, endorse the check in front of the teller and present his identification. At this point in time, Harris did not even know of the check.

the Bank of America at Los Angeles. He then went to Mexico for a few days. Upon his return, he drew a check for $45,000 on this new Los ·Angeles Bank of America account and directed his stepdaughter, Annette Furiani, to cash the check at the bank and bring him the proceeds. He placed the cash in his briefcase and "hauled it around in his car" for a month. This cash was later used to purchase an Arizona nightclub, the Alibi Club.

Certain other withdrawals were made by E. F. Wennermark against the $52,000.74 progress payment check he had deposited with Mrs. Barnes at the Highland Branch of the Bank of America. There was a check for $100 made out to cash. E. F. Wennermark could not say what had happened to the proceeds. A check for $2,135.52 was drawn to pay off E. F. Wennermark's personal note on his trailer home. A check for $93.25 was used to pay a restaurant bill. One check for $3,000 made out to cash (with no endorsement on the back) was drawn on the account. E. F. Wennermark could not say what had happened to the proceeds. There was a salary check payable to Mrs. Norma Miller. The face of the check states the amount of $175 in figures, but the amount of $125 in writing. One check for $1,000 was made payable to "Wennermark & Harris." A $500 check was drawn on the account, payable to the aforementioned Annette Furiani.

When the fifth progress payment check for $52,000.74 had failed to appear in the San Bernardino office of the joint venture when expected, and E. F. Wennermark had "disappeared," the younger Wennermark and Emmett Harris were greatly concerned. Their concern was heightened when Harris telephoned the disbursing office of the U.S. Treasury in San Francisco and learned that the check dated June 7th had in fact been mailed.

On June 16, 1965, James L. Wennermark and Emmett Harris visited the Finance Officer at the Bureau of Reclamation office in Yuma, Arizona, to inquire about the fifth progress payment check. They were advised that they could request "stop payment" on the check. On that same day the younger Wennermark and Harris addressed a letter to A. B. West, Regional Director of the Bureau of Reclamation at Boulder City, Nevada, requesting that payment be stopped on the check. They also sought reissuance of the check to the joint venture; but the check has never been reissued.

On June 25, 1965, the Treasurer of the United States declined payment of the check to the Bank. The younger Wennermark and Emmett Harris executed and transmitted to the U.S. Treasurer, on July 7, 1965, a "Claim against the United States for the Proceeds of a Government Check or Checks" wherein they stated that "neither the endorsement of James L. Wennermark or Emmett J. Harris was made with the consent, agreement or understanding with anyone."

Thereafter, on July 29, 1965, the joint venture advised plaintiff surety that it was unable to complete the contract. In the same letter, the joint venture acknowledged a loan agreement with plaintiff setting up a joint account in the Security First National Bank, Los Angeles, to handle completion of the contract, and a power of attorney to the attorney for plaintiff surety authorizing him to endorse future Government estimate checks for deposit in this joint account. The contract was completed, and accepted by the Government on August 19, 1965.

On October 22, 1965, the third party Bank wrote to the Treasurer of the United States demanding payment of the amount of the fifth progress payment check on the ground that E. F. Wennermark had possessed authority to endorse the check on behalf of the joint venture. Robert E. Brimberry, an attorney for plaintiff surety, addressed a letter dated November 1, 1965, to the Treasurer of the United States, stating that the loss to the joint venture due to the withholding of the $52,000.74 check "has actually now been suffered by the surety." On

March 27, 1966, the joint venture executed a release to the United States through the contracting agency in exchange for remittance of the final payment. Excepted from the release, was claim for the check in question.

In the course of the trial, plaintiff surety offered evidence in the form of canceled drafts that in financing the joint venture to completion, it suffered a net loss over and above any credits it received during the course of performance from the Government, or thereafter from members of the joint venture. The surety offered evidence that the total amount expended by it was $101,057.75, and that the total credits against this sum were $30,316.32. The net loss was placed at $70,741.43, a sum in excess of the amount of the check here involved. The third party Bank offered proof to diminish the amount of the loss alleged to have been suffered by the surety. However, all proofs taken together establish that plaintiff surety, in financing the contract to completion, suffered a net loss greatly in excess of the $52,000.74 here at issue.

Before dealing with the issue of "whether the plaintiff or the Bank is entitled to recover the contract balance now held by the defendant * * * in a stakeholder capacity," [14] it is necessary to dispose of a number of arguments raised by defendant's counsel, who declines to accept the role of stakeholder.

█ Briefly stated, it is argued on the one hand that the sum in dispute has already been paid by the Government. The simple answer to this argument is that it is manifestly incorrect. The clear and undisputed facts are that the work represented by this progress payment check was performed; a check was issued in payment thereof; with the advice and assistance of Government officials, a "stop payment" was requested on the check by the contractor and, accordingly, the Treasurer of the United States declined payment thereof; and a

request by the contractor for reissuance of the check was denied. Reissuance was denied because the Treasurer of the United States was advised by the General Accounting Office that "further action must be held in abeyance until such time [as] a judicial determination is made establishing the party entitled" to the proceeds of the check in question. In sum, the General Accounting Office, the Treasurer of the United States, the plaintiff, the third party defendant, and this court in its prior treatment of the case, are all of the opinion that the issue is whether the plaintiff or the Bank is entitled to recover an unpaid contract balance now held by the defendant in a stakeholder capacity. There is nothing in the record to support a contrary opinion as to the issue.

█ Relying principally upon Home Indemnity Co. v. United States, 376 F.2d 890, 180 Ct.Cl. 173 (1967), defendant's counsel also argues strenuously that plaintiff surety has no claim because the Government had no formal notice of the fact that the surety was financing completion of the contract work and paying the outstanding bills thereby incurred by the joint venture. Counsel's reliance on *Home Indemnity,* and that line of cases, is wholly misplaced.

In *Home Indemnity* the United States had *paid out the contract balance to the contractor.* Having given notice to the Government of its interest prior to such payment, the surety sued the Government, claiming that the moneys *had been wrongfully paid to the contractor.* In that case, the United States was being asked to pay twice. This case presents a wholly different situation; the Government still has the contract balance in its possession, having never paid the fifth progress payment check to the contractor or anyone else.

In contrast, in Fidelity & Deposit Co. v. United States, 393 F.2d 834, 837, 183 Ct.Cl. 908, 912 (1968), where the double

---

14. *See* text *supra* at note 9.

payment problems of *Home Indemnity* were not involved, the court observed:

> * * * It is not necessary that there be a formal declaration of the contractor's default. All that is necessary for the surety to prevail is that the contractor be in default as a matter of fact; and that as a result of such default, the surety has become obligated to pay under its payment or performance bond. The surety's potential rights become an actuality when it pays the obligations of its principal. Thereupon, the surety's rights of subrogation relate back to the date of the execution of the surety bonds. [Citations omitted.]

When the joint venture, by letter of July 29, 1965, advised plaintiff surety that it was unable to complete the contract work, it acknowledged that it was in actual default on the contract. Although the surety or joint venture did not then formally convey notice of default to the Government, the obligation of the surety then vested under its performance and payment bonds. There followed the loan agreement and joint account earlier mentioned, and the financing by the surety of the contract to completion. The surety was then subrogated to whatever rights the contractor had in the contract balance.[15]

This case is very close to Morgenthau v. Fidelity & Deposit Co., 68 App.D.C. 163, 94 F.2d 632 (1937), which has been favorably cited by the court in Hardin County Sav. Bank v. United States, 65 F.Supp. 1017, 1022, 106 Ct.Cl. 577, 598 (1946). *Morgenthau* also involved a situation in which the surety advanced money to a Government contractor to enable the contractor to complete the contract. In analyzing the surety's position in those circumstances, the court stated at 94 F.2d 635:

> * * * The contractor failed to carry out his contract, and the surety advanced the money, and in addition paid all the labor and material bills still unpaid. It did this, not as a volunteer, but by reason of its contract entered into before the commencement of the work. Its advance to the contractor and its payment to the laborers and materialmen released the contractor from his obligations under the contract and, as the Supreme Court said in Henningsen v. U.S.F. & G. Co., 208 U.S. 404 [28 S.Ct. 389, 52 L.Ed. 547] * * * likewise released the government from all equitable obligations to see that the laborers and supplymen were paid. It thereby became subrogated to the equity of the United States. Its action created in itself an equitable right which entitled it to demand and receive the balance due from the United States * * *.

The plaintiff in this case has acquired similar equitable rights by reason of its expenditures. Without those expenditures, the contract would not have been completed by the joint venture.

It is not clear from defendant's brief just whom it believes should receive the proceeds of the check, unless perhaps it is the contractor or the third party Bank which negotiated it on E. F. Wennermark's endorsement. Considering the contractor as a potential payee, suffice it to say the joint venture makes no claim to the check proceeds, and James L. Wennermark and Emmett Harris testified on behalf of plaintiff to many of the facts upon which plaintiff relies to support its claim. They initiated the "stop payment" on the check, denied E. F. Wennermark's right to endorse it and to appropriate the proceeds, and confirmed the surety's rights by the aforementioned assignments and designation of the surety as their attorney in fact. All this was in furtherance of their joint effort to complete this Government

---

15. See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); Henningsen v. United States Fidelity & Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Prairie State Bank v. United States, 164 U.S. 227, 231–232, 17 S.Ct. 142, 41 L.Ed. 412 (1896); and National Surety Corp. v. United States, 133 F.Supp. 381, 132 Ct. Cl. 724 (1955).

1309

contract, and to avoid a formal default termination.

As for the testimony elicited by defendant on behalf of E. F. Wennermark's authority in this transaction, it is best covered along with the discussion hereinafter of the Bank's arguments supporting its claim to the check proceeds. The rights of the third party Bank depend upon the authority of E. F. Wennermark to endorse the Treasury check made payable to the joint venture. This is the rule enunciated in the Uniform Commercial Code,[16] § 3–404 of which provides in part:

> (1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it * * *.[17]

The Official Comment to this section[18] further explains that:

> A person who is allegedly bound by an instrument may deny that he is bound because what purports to be his signature is unauthorized. Such a defense, if successfully maintained, is valid against all holders, including those having the rights of a holder in due course.

The names "James L. Wennermark" and "Emmett J. Harris," as endorsees, placed on the fifth progress payment check by E. F. Wennermark, constituted unauthorized endorsements. They did not bind the joint venture nor did they bind plaintiff surety which derives its rights through its bonding relationship with the joint venture. Third party defendant is therefore not even a "holder" of the instrument entitled to payment since a " '(h)older' means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank."[19]

The Uniform Commercial Code § 1–201(43)[20] defines an unauthorized endorsement as follows:

> 'Unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery.

Applied to the facts of this case, this provision of the Code would require actual, implied, or apparent authority on the part of E. F. Wennermark to bind both James L. Wennermark and Emmett Harris when he placed their signatures on the check.

The burden of proving this authority rests upon the third party defendant Bank.[21] That burden has not been sustained.

The evidence does not establish that E. F. Wennermark had actual or implied or apparent authority to endorse the names of both James L. Wennermark and Emmett J. Harris. Moreover, the Bank has not even argued that authority to sign just one of those names would be sufficient to make it a holder, or holder in due course of the check.[22] On the basis of the facts developed at the trial, it is concluded that the Bank acquired no

16. Cited with approval by this court. *See, for example,* Northern Helex Co. v. United States, 455 F.2d 546, 197 Ct.Cl. 118 (1972).

17. Identical to Cal.U.C.C.A. § 3–404.

18. Comment 3–404:3(a).

19. U.C.C. § 1–201(20).

20. Identical to Cal.U.C.C.A. § 1–201.

21. And upon defendant, if it elects to depart from its role as stakeholder. "Whenever the existence of the relationship of principal and agent is in issue, the burden of proving the issue rests with the party who asserts the affirmative—that is, the party asserting the existence of the relationship. It is also a general principle that one who has dealt with an agent or who has availed himself of the act of an agent must, in order to charge the principal, prove the authority under which the agent acted; in other words, he has the burden of establishing the agent's authority to bind the principal by the act or contract in controversy. * * *" 3 Am.Jur.2d Agency § 348 (1962).

22. It is also worthy of note that the signature card for the joint venture account at Security First National required both signatures.

right to the proceeds of the check, and that plaintiff is entitled thereto.

The concepts of actual, implied, and apparent authority are not sharply defined. Courts, text writers, and codes assign differing meanings (and in some cases different names) to these differing types of authority. The Uniform Commercial Code, moreover, is silent as to the meaning it gives these words. But regardless of the meaning assigned, neither actual, nor implied, nor apparent authority in E. F. Wennermark to sign the names of both principals in this joint venture can be found in this record.

The Restatement (Second) of Agency § 7 (1958) defines "authority" (as distinguished from "apparent authority" and "inherent agency power") as:

* * * the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.

The Comment to § 7 indicates that "manifestation" means the expression of the will (as distinguished from the undisclosed purpose or intention), and that the manifestation may be made by words or other conduct, including acquiescence. In other words, the manifestation may be "express" or "implied."

By way of comparison, the California Civil Code § 2316 (West 1970) defines "actual" authority (as distinguished from "necessary" authority and "ostensible" authority) as: " * * * such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." In a gloss upon this section of the code, the California case of Hobart v. Hobart Estate Co., 26 Cal.2d 412, 159 P.2d 958 (1945),

observes that actual authority may be implied as well as express.

The California Civil Code § 2319 separately defines "necessary authority"[23] as follows:

An agent has authority:

1. To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency; and,

2. To make a representation respecting any matter of fact, not including the terms of his authority, but upon which his right to use his authority depends, *and the truth of which cannot be determined by the use of reasonable diligence* on the part of the person to whom the representation is made. [Emphasis supplied.][24]

The evidence certainly fails to demonstrate that E. F. Wennermark had "actual" or "implied" authority to endorse his son's name and that of Emmett Harris to the fifth progress payment check. No credible evidence was offered to support a finding that the joint venture agreement conferred such a power. Both the younger Wennermark and Emmett Harris emphatically denied that they had expressly conferred such authority. E. F. Wennermark had never before signed either his son's name or Harris' name to any prior joint venture progress payment check. Hence there were no manifestations nor acts of acquiescence on the part of the younger Wennermark and Harris which can be said to have established express or implied authority to endorse their names to the check. Significantly, the elder Wennermark obviously did not himself believe that he possessed such authority. His conduct immediately prior to, in the course of, and following his repeated efforts to deposit the check in the Wen-

23. "Necessary authority" is a concept which 3 Am.Jur.2d Agency § 71 (1962) regards as included within the concept of "implied authority."

24. A similar concept is reflected in Restatement (Second) of Agency § 35 (1958) which includes among the implied powers, the "incidental" authority to do acts reasonably necessary to accomplish the purposes of the agency.

nermark account, was devious, furtive, and fugitive.

Nor can it be said that the authority to sign progress payment checks was necessary to the accomplishment of E. F. Wennermark's responsibilities. His responsibilities did not include the depositing of progress payment checks in the joint venture account. That was the job of the joint venture secretary, Mrs. Miller. Nor was his signature on or his signing of the progress payment check necessary, for it is clear that the *joint venture's* bank regularly accepted stamped or typed endorsements "for deposit only" to the joint venture account.

The Bank relies heavily on the general power of attorney by the younger Wennermark, executed back in 1960 or 1961 and conferring broad authority on his father to transact any kind of business in his name. It also stresses the fact that the elder Wennermark signed several joint venture documents, as well as joint venture payroll checks as drawee, in the name of James L. Wennermark. But this relates to only one of the two joint venturers. Moreover, this somewhat stale power of attorney, which was of questionable origin and was related to a transaction remote in time, business relationship, and purpose from the transaction here involved, standing by itself or in conjunction with the other acts of E. F. Wennermark, is not sufficient to establish the authority to sign joint venture progress payment checks, in the face of all other evidence to the contrary.[25] The authority of an agent to make or endorse negotiable instruments is not lightly inferred, nor implied.[26]

The Bank also fails in its efforts to demonstrate "apparent" or "ostensible" authority on these facts. In American Anchor & Chain Corp. v. United States, 331 F.2d 860, 861–862, 166 Ct.Cl. 1, 3–4 (1964), the court stated with respect to "apparent" authority:

A. It is now commonplace that, except where formality is expressly required, apparent authority to do an act on behalf of a principal may be created by written or spoken words or other conduct of the principal which, if reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him. A.L.I., Restatement, Agency 2d § 27 (1958); Standard Oil Co. v. Lyons, 130 F.2d 965, 968 (C.A. 8, 1942). The heart of this principle is that it is fair—especially in a complex society where transactions are most often carried on through others —to require "one who allows another to appear to be his agent * * * [to] bear any loss resulting to a third party from his dealings with the apparent agent in that capacity in reliance on his supposed authority." Mechem, Outlines of the Law of Agency (4th ed., 1952), § 84. * * *

In the same vein, the Restatement (Second) of Agency § 8 (1958) describes apparent authority as: " * * * the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."[27] Similarly, the California Civil Code § 2317

25. In addition, James L. Wennermark had no personal, independent recollection of having signed the power of attorney. Only after much hesitation did he at the trial identify the signature on the power of attorney as his own. There is no reliable proof that the power of attorney was ever placed on file with any third party.

26. *See, for example,* Arcade Realty Co. v. Bank of Commerce, 180 Cal. 318, 181 P. 66 (1919).

27. The Comment to § 8c emphasizes that apparent authority exists only where the third person *believes* the agent to be authorized to do the act in question.

(West 1970) defines ostensible authority as: " * * * such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." In construing this section, the often cited case of Harris v. San Diego Flume Co., 87 Cal. 526, 25 P. 758 (1891), held that one who seeks to charge a principal on the basis of ostensible authority must himself *believe* that the agent had authority to perform the act in question.

On the facts of this case, the Bank could not have entertained any reasonable belief that E. F. Wennermark had authority to sign the names of either James L. Wennermark or Emmett J. Harris. At the time of the attempted negotiation of the fifth progress payment check at its Highland Branch, the Bank of America was aware that E. F. Wennermark was signing the name "James L. Wennermark" as agent since he did so in front of its teller, Mrs. Barnes. The Wennermark Company account was at this Bank. E. F. Wennermark had in the past, when depositing checks payable to Wennermark Company or withdrawing funds from the Wennermark Company account, regularly signed his own name, E. F. Wennermark. E. F. Wennermark was known at the Bank as E. F. Wennermark. The record is devoid of evidence that the younger Wennermark intentionally or by want of ordinary care caused or allowed the Bank of America to believe that his father possessed the authority to sign the name "James L. Wennermark."

His lack of authority with respect to his endorsement of Emmett Harris' name on the progress payment check is even more obvious. The Bank never believed that E. F. Wennermark had authority to sign Harris' name. Both the teller and one of the officers treated the check as a two-party check from the beginning. The elder Wennermark was expressly told that the signature of the other payee, Emmett J. Harris, was required. In fact the Bank initially ad-

vised E. F. Wennermark that its procedures required that Harris come to the Bank, endorse the check in front of the teller, and present his identification. There was no intimation that, alternatively, E. F. Wennermark could sign as agent for Harris. If that were permissible, he could and would have done so then and there. On the contrary, in violation of its own stated procedure, the Bank later accepted the progress payment check for deposit upon the representation of E. F. Wennermark that he had delivered the check to Harris, who had supposedly signed it. The Bank at no time relied upon the belief that E. F. Wennermark was authorized to sign Emmett Harris' name.

The Bank also urges that the elder Wennermark was actually a member of the joint venture, and therefore had authority to endorse its checks. Likening joint adventures to partners, the Bank cites the general rule that: "A partner has *apparent* authority to indorse checks and notes." [Emphasis supplied.][28] However, even assuming *arguendo* that a joint adventurer is equivalent to a partner, and assuming further that the elder Wennermark was a joint adventurer with Emmett Harris (a highly doubtful finding on the facts of this case), that would be only a beginning point, and not dispositive of the issue of his authority to endorse checks payable to the joint venture. As the rule cited by the Bank provides, a joint venturer (partner) has "apparent" authority to sign checks payable to the joint venture. The apparent authority of E. F. Wennermark to sign checks as a partner or joint venturer was not relied upon by the Bank and therefore the doctrine of apparent authority has no application. The Bank did not rely upon E. F. Wennermark's apparent authority to endorse Emmett J. Harris' name, but rather relied (in contravention of its own previously stated procedure) upon the representations of E. F. Wenner-

28. Crane & Bromberg, Law of Partnership, § 50(g), at 287 (1968).

mark that he had secured Harris' actual signature from Harris himself.[29]

All of the foregoing considered, it is concluded that plaintiff is entitled to judgment for the contract balance of $52,000.74.

---

29. Lentz v. United States, 171 Ct.Cl. 537, 346 F.2d 570 (1965), upon which the Bank strongly relies in its presentation to the judges, did not hold that a partner or joint venturer has such actual authority to collect payment that it makes no difference whether the payor knows of or relies upon that authority, or even knows that the payees constitute a joint venture. Among other significant differences from the present case, the facts in

Lentz showed that the Federal Government (unlike the Bank here) was amply on notice that it was dealing with a joint venture, and (again unlike the situation here) that the Government could properly rely on an already existing practice of having checks to the joint venture endorsed by only one member. [Footnote by the court.]

