The **AETNA CASUALTY &**
**SURETY COMPANY**

v.

The **UNITED STATES**

No. 65–85C.

United States Claims Court.

April 27, 1987.

Adrian L. Bastianelli, III, Washington, D.C., for plaintiff; Dempsey, Bastianelli & Brown, Chartered, of counsel.

Michael T. Paul, Washington, D.C., with whom were Asst. Attys. Gen. Richard K. Willard and David M. Cohen, for defendant; Alan F. Elmore, Chesapeake Div., Naval Facilities Engineering Command, Dept. of Navy, of counsel.

## OPINION

WHITE, Senior Judge.

This case involves three contracts which the Naval Facilities Engineering Command (NAVFAC), Department of the Navy, awarded to Mansfield Contracting Corporation (Mansfield) and with respect to which the plaintiff, The Aetna Casualty & Surety Company (Aetna), issued payment and performance bonds.

In the present action, Aetna alleges that, as performing surety, it was entitled to funds under the contracts which NAVFAC erroneously released to the Internal Revenue Service (IRS) and, further, that Aetna, as performing surety, is also entitled to any funds which are due under the contracts and are being retained by NAVFAC.

A trial on the merits was held in January 1987, and counsel for the parties subsequently submitted post-trial briefs for the consideration of the court.

### The Facts

The facts, as found by the court on the basis of the evidence in the record, are outlined in this part of the opinion.

On March 10, 1981, NAVFAC awarded Contract No. N62477–79–C–0020 (OCS contract) to Mansfield for the construction of the OCS Complex Dining Facility, Quantico Marine Base, Quantico, Virginia. The original OCS contract price was $2,552,777. Also in March 1981, Aetna issued a payment bond and a performance bond with respect to the OCS contract, each bond naming Mansfield as principal and Aetna as surety. Aetna's maximum liability was $2,552,777 under the performance bond, and $1,021,110.80 under the payment bond.

NAVFAC awarded Contract No. N62477–79–C–0447 (EMO contract) to Mansfield on February 18, 1982, for the renovation of, and addition to, the EMO Club, Naval Medical Command, Bethesda, Maryland. The original EMO contract price was $1,217,777. On February 18, 1982, Aetna issued a payment bond and a performance bond in connection with the EMO contract, naming Mansfield as principal and Aetna as surety on each bond. Aetna's maximum liability was $1,217,777 under the performance bond, and $608,889 under the payment bond.

On July 8, 1982, NAVFAC awarded Contract No. N62477–81–C–0118 (Fire Station contract) to Mansfield for the construction of a new fire station at the Quantico Marine Base, Quantico, Virginia. The original Fire Station contract price was $387,777. On July 15, 1982, Aetna issued a payment bond and a performance bond on the Fire Station contract, naming Mansfield as principal and Aetna as surety on each bond. Aetna's maximum liability under the performance bond was $387,777, and $193,888.50 under the payment bond.

On December 7, 1982, Mansfield advised Aetna that it was unable to meet its obligations under the three contracts. Because of Aetna's bond obligations, Aetna began to fund Mansfield's operations under these contracts. Between February and September of 1983, Aetna provided Mansfield: with $464,194 for use on the OCS contract; with $922,817 for use on the EMO contract; and with $252,327 for use on the Fire Station contract.

While Aetna was engaged in the process of funding Mansfield's operations under the three contracts, Aetna formally entered into a financing agreement with Mansfield on June 21, 1983. In it, Aetna agreed to "advance on a temporary basis" to Mansfield costs on Aetna's bonded contracts, "limited to those sums which Aetna would be obligated to provide under its payment bonds."

In late September of 1983, Mansfield advised Aetna that its future earnings under the three contracts would be sufficient to permit Mansfield to complete the work under the contracts. Accordingly, Aetna stopped providing finances directly to Mansfield. From October 1983 to February of 1984, Mansfield used funds received from NAVFAC in performing work under the three contracts. Nevertheless, Aetna still made payments to subcontractors and suppliers under the three contracts after October of 1983, in the following amounts: $64,741 under the OCS contract, $110,084 under the EMO contract, and $36,257 under the Fire Station contract.

During the fall of 1983, as Mansfield was behind schedule on all three of the projects that are involved in this case, a representative of NAVFAC chaired three meetings with representatives of Mansfield and of Aetna, at which NAVFAC expressed its concern over the need to obtain an adequate completion of the three projects by Mansfield. Aetna's representative made it plain that Aetna would discharge its obligations if NAVFAC terminated the contracts for default, but otherwise Aetna would limit its activities to paying bills of subcontractors and suppliers. During these meetings, Mansfield presented new completion schedules to NAVFAC, but thereafter Mansfield never complied with the new schedules. This convinced NAVFAC that Mansfield was not capable of completing the three jobs that are involved in the present case.

NAVFAC took beneficial occupancy of the OCS project on October 31, 1983. As of October 31, 1983, approximately $75,000 worth of work was left to be done on the OCS project, and the OCS Dining Facility was not usable for its intended purpose. For example, the dishwashers were not operating properly, the garbage disposal system was not operating properly, at least one refrigerator and freezer did not maintain the specified temperatures, and deficiencies existed in the roof and in the landscaping. After October 31, 1983, a representative of NAVFAC dealt directly with Mansfield's subcontractors in an effort to get them to complete the OCS project, while Aetna paid the bills of subcontractors and suppliers on the OCS project to the extent of $64,741. In the end, the subcontractors left the OCS project with a substantial number of punch-list items not having been completed.

On May 17, 1985, NAVFAC issued a unilateral modification of the OCS contract, deducting $12,382 for punch-list items which Mansfield's subcontractors never performed.

NAVFAC took beneficial occupancy of the EMO project on December 30, 1983. At that time, the EMO project could not be used for its intended purposes because of various deficiencies that existed, including the following: the kitchen equipment was not fully usable; the cabinet work in the kitchen, in the bars, and in the dining room was unfinished; interior doors had not been installed; flooring was missing in certain places; drywall had not been installed; bathroom flushometers did not work properly; the windows and the skylight had leaks; and the heating, air conditioning, and ventilation system was not operative.

On January 20, 1984, NAVFAC issued a unilateral modification of the EMO contract, deducting $70,285 from the contract price for work which Mansfield did not perform. NAVFAC used this money to fund new contracts with several specialty contractors to secure the completion of the OCS project.

Mansfield's workers walked off the Fire Station jobsite on February 3, 1984, after Aetna refused to pay Mansfield's payroll; and the workers did not return thereafter. As of February 3, 1984, the Fire Station project was not usable for its intended purpose. For example: the roof was incomplete, with the result that the interior suffered water damage; the fire alarm system was not operational; the electrical work was unfinished; and the landscaping and sidewalks were incomplete.

Because the work on the Fire Station project was incomplete, NAVFAC issued a deductive change order in the amount of $42,185 with respect to the Fire Station contract on April 23, 1984. NAVFAC en-

tered into five contracts with specialty contractors in order to secure the completion of the work on the Fire Station project.

On September 29, 1983, Aetna advised NAVFAC in writing of the amounts which it had spent on the three contracts, and requested that all funds still being held by NAVFAC under the contracts be paid to Aetna. On October 20, 1983, NAVFAC rejected Aetna's request, on the ground that Aetna did not qualify for such payment under the Assignment of Claims Act.

On December 20, 1983, the Internal Revenue Service (IRS) prepared a Notice of Levy in the amount of $270,591.58 on funds payable under the OCS, EMO, and Fire Station contracts for taxes owed by Mansfield to the IRS. Pursuant to this levy, NAVFAC released $181,405 to the IRS on March 21, 1984. This amount represented funds owed to Mansfield in partial payment on the OCS contract. On the same date, NAVFAC also released $12,154 to the IRS, this sum representing funds owed to Mansfield in partial payment for services performed under the Fire Station contract. NAVFAC did not notify Aetna of these IRS levies before transferring the funds to the IRS.

By a series of letters written during the May-October period of 1984, Aetna objected to the actions by NAVFAC in releasing contract funds to the IRS. In a communication dated December 21, 1984, NAVFAC took the position that it properly released the funds pursuant to a valid tax levy, and that Aetna's rights as a surety did not entitle it to the funds transferred to the IRS.

At the time of the trial, NAVFAC was still retaining the following amounts under the three contracts: $30,053 under the OCS contract, $100,233 under the EMO contract, and $28,216 under the Fire Station contract.

### Discussion

### Suretyship

■ This case turns on the distinction between a payment bond and a performance bond. Under a payment bond, the surety guarantees that subcontractors, laborers, and materialmen will be paid in the event of the principal's default. Thus, a payment bond protects the subcontractors, laborers, and materialmen. Under a performance bond, on the other hand, the surety guarantees that a project will be completed in the event of the principal's default. This bond, in the case of a government contract, protects the Government by ensuring that the Government is not left with an unfinished project due to a contractor's insolvency. *See Morrison Assurance Co. v. United States*, 3 Cl.Ct. 626, 632 (1983).

The surety has different rights under these two types of bonds. As the Court of Claims said in *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 12, 475 F.2d 1377, 1383 (1973):

> * * * A surety that pays on a performance bond in order to complete the subject contract has priority over the United States to the retainages in its hands. A surety that pays on its payment bond, however, does not have priority when the United States is asserting a tax or other obligation owed by the prime contractor. * * *

With respect to the unique rights of a performing surety, the Fifth Circuit has said that "[t]he surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the government" (footnote omitted). *Trinity Universal Insurance Co. v. United States*, 382 F.2d 317, 320 (5th Cir. 1967), *cert. denied*, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968).

It is clear, therefore, that Aetna's right to recover in this case for monies previously transferred by NAVFAC to the IRS, or to recover retainages held by NAVFAC under the three contracts, depends upon whether Aetna was discharging its obligations under the performance bonds when it funded Mansfield's operations and, later, when it paid amounts to subcontractors and suppliers. (With respect to the retainages, the plaintiff concedes in its post-trial

brief (at 16) that "[i]f Aetna made these expenditures to meet its obligations under the payment bonds, the IRS would have a priority to the remaining proceeds.")

Aetna qualifies as a performing surety in this case if—and only if—it assumed the primary responsibility for the completion of the work under the several contracts. *Morrison*, 3 Cl.Ct. at 633–34; *see Great American Insurance Co. v. United States*, 202 Ct.Cl. 532, 550, 481 F.2d 1298, 1308 (1973) (quoting *Fidelity & Deposit Co. v. United States*, 183 Ct.Cl. 908, 912, 393 F.2d 834, 837 (1968)). Neither a formal default by Mansfield (*Great American*, 202 Ct.Cl. at 550, 481 F.2d at 1308), nor a formal take-over of the projects by Aetna *Morrison*, 3 Cl.Ct. at 634 (quoting *Aetna Casualty & Surety Co. v. United States*, 435 F.2d 1082, 1083 (5th Cir.1970)), was required.

Inasmuch as neither a formal default by Mansfield nor a formal take-over by Aetna occurred in this case, the court's consideration is directed toward the question of whether Aetna, as a matter of fact, assumed the responsibility for the completion of performance under the several contracts. *See Great American*, 202 Ct.Cl. at 550, 481 F.2d at 1308.

■ After carefully reviewing the evidence in this case, the court concludes that Aetna never assumed the responsibility for the completion of the three projects, or any of them. Aetna did not indicate that it was assuming such responsibility during the February-September period of 1983, when Aetna was actually funding Mansfield's operations. For example, during the midst of that period, when Aetna entered into a financing agreement with Mansfield on June 21, 1983, Aetna agreed to "advance on a *temporary* basis" funds to Mansfield, "limited to those funds which Aetna would be obligated to provide under its *payment* bonds" (emphasis supplied). This indicates clearly that, although Aetna was funding Mansfield's operations at the time, Aetna was not assuming the responsibility for the ultimate completion of the work on the three projects.

Also, in the fall of 1983, when representatives of NAVFAC, of Aetna, and of Mansfield were meeting because of concern over Mansfield having fallen behind schedule on all three projects, it was Mansfield that was expected to present, and did present, new completion schedules. This indicates that both NAVFAC and Aetna were looking to Mansfield for the completion of the work on the three projects. Obviously, none of the participants believed that Aetna had assumed the responsibility for such completion. In fact, Aetna's representative at these meetings indicated rather clearly that it had not assumed such responsibility, although it was paying bills of subcontractors and suppliers at the time.

Furthermore, neither Mansfield nor Aetna actually completed the work under any of the three contracts involved in this case. In the end, NAVFAC made deductions from each of the three original contract prices because of work which was required by the several contracts but was never performed by the contractor or surety.

As Aetna was not acting in the role of a performing surety when it advanced funds directly to Mansfield during the February-September period of 1983, or when it made payments to subcontractors and suppliers after October of 1983, Aetna's claim for reimbursement out of funds payable under the three contracts involved in this case is inferior to the tax claims asserted by the Government against Mansfield, the contractor. *United States Fidelity & Guaranty Co.*, 201 Ct.Cl. at 12, 475 F.2d at 1383.

It necessarily follows that the plaintiff is not entitled to recover in this case.

### Equitable Adjustment

Aetna requests that the court require NAVFAC to negotiate with Aetna concerning an equitable adjustment allegedly due Mansfield for work performed on the OCS project. However, in the light of Aetna's concession that the IRS has a prior claim to all contract funds retained by NAVFAC, the equitable adjustment issue is moot. Consequently, the court does not reach that issue.

### CONCLUSION OF LAW

Upon the facts as found by the court, and the discussion in the opinion, the court

concludes as a matter of law that the plaintiff is not entitled to recover.

The clerk will therefore dismiss the complaint.

Each party shall bear its own costs.

IT IS SO ORDERED.